PEAT MARWICK MAIN & COMPANY,
Successor to Certain Interests of KMG
Main Hurdman, Petitioner and Cross–
Respondent,

v.

Lawrence F. HAASS, Respondent
and Cross–Petitioner.

No. C–9128.

Supreme Court of Texas.

Sept. 11, 1991.

Rehearing Overruled Dec. 11, 1991.

W. Wendell Hall, Dan Matthews, San Antonio, for petitioner and cross-respondent.

Paul M. Green, San Antonio, for respondent and cross-petitioner.

## OPINION

GAMMAGE, Justice.

This is a contract construction case involving a merger agreement between two accounting firms and the contractual damages provision for a departing partner who takes clients from the firm. The court of appeals held one damages provision was an unenforceable restraint on trade but the other provision was enforceable. 775 S.W.2d 698. We hold that a damages provision affecting the right to render personal services operates as a restraint of trade and must be judged by the reasonableness standards for covenants not to compete, and that the sole relevant contractual provision at issue is unreasonable. We reverse the judgment of the court of appeals because it provided for a remand on the irrelevant damages provision, and affirm the trial court judgment.

The underlying dispute began as a merger of two accounting firms. Lawrence Haass was the youngest of four major partners in the San Antonio accounting firm of Chorpening Jungmann and Company. The percentage ownerships for major partners were John Sowell (35%), Walter Jungmann (25%), Anthony Koch (22.5%), and Haass (11.5%). Jungmann and Koch wanted to retire immediately, and Sowell was considering retirement, but they were concerned about the firm's capacity to insure retirement benefits for all three. Without informing Haass, Jungmann, Koch and Sowell approached Main Hurdmann,[1] a large international accounting firm with a relatively small San Antonio branch office,

about the possibility of a merger. Identifying the respective accounting firms with their initials, the merger proposal was that MH would acquire CJ's client base and goodwill in return for MH's payment of retirement, disability and death benefits to the retiring partners. Haass was not included in any of the preliminary negotiations. Haass was not to receive any kind of immediate compensation for his share of the CJ client base. Rather, his share in CJ was to be transferred to MH, and he was to become an MH partner in proportion to his CJ interest.

The senior partners only presented the proposal to Haass after the basic agreement was reached. Haass from the beginning voiced his objections to the MH partners involved and the other CJ partners. Haass expressed his concerns that "the big firm, national firm atmosphere versus a small firm" would result in the office being "run from some other office" far away. Haass was concerned that the professional development of the CJ accountants and the service to their existing clients would both suffer from the proposed merger. Haass opposed the merger.

Haass was the linchpin of the merger. Internal MH merger evaluation documents demonstrate that without Haass' participation, the merger deal with CJ was not attractive to MH. The retiring CJ partners threatened Haass with a lawsuit if he did not go along with the merger. Additionally, they agreed with MH to a reduction of their retirement benefits if Haass left the combined firm. To alleviate Haass' concern, MH represented to him that Sowell would be the partner in charge of the merged San Antonio office, and that Haass would be the partner in charge of the combined services area. MH and Haass further had the understanding that Sowell was going to run the office to the extent possible under MH's policies and proce-

---

**1.** Main Hurdman itself subsequently merged with another large international accounting firm, to form Peat Marwick Main. Although Peat Marwick Main succeeds to the interest of Main Hurdman and is the party on appeal, we refer to the acquiring accounting firm as Main Hurdman or MH in stating the facts.

dures.[2] Further, MH agreed to a provision guaranteeing Haass' income to be over $91,000 for the first twenty months after the merger. Although he continued to express misgivings, Haass eventually signed the merger agreement.

The merger agreement set forth the details as to assets, liabilities, retirement benefits, computation of partnership shares in the merged firm, and other matters necessary to memorialize the transaction. In particular, the merger agreement incorpo-

rated by reference the standard MH partnership agreement. Paragraph 11 of the merger agreement provided that if Haass withdrew from MH and took MH clients with him that he would compensate MH as provided for in the partnership agreement. Haass did not separately sign the partnership agreement, which contains the damages provisions for partners terminating "other than by retirement" at issue.[3]

The plan for Sowell to smooth the transition as partner in charge went awry. Al-

**2.** The representations and transactions during negotiations and after the merger were the subject of jury findings favorable to Haass on legal theories of fraudulent inducement, misrepresentation, duress, lack or failure of consideration, estoppel, and related theories. The court of appeals held there was no evidence to support the favorable jury findings, and Haass attacked the no evidence holdings in his own application for writ of error in this court. Because we are in basic agreement with the analysis and holdings of the court of appeals on these issues, we limit our discussion to the restraint of trade and penalty issues on which the court of appeals ruled favorably to Haass. For the expanded discussion of the evidence related to these other issues, see 775 S.W.2d at 702–707.

**3.** The section from the partnership agreement in its entirety provides:

*Termination Other Than by Retirement—Payment to Firm*

(1) Any partner or principal who terminates or is involuntarily terminated, and in either situation is not entitled to any retirement benefits, and who, during the period of twenty-four months thereafter, solicits or furnishes accounting or related services to Firm clients shall compensate the Firm as hereinafter provided. Firm clients shall include any party who was a client of the Firm as of the termination date or became such a client during the twenty–four–(24)–month period thereafter, or any other party in which such clients are a principal party in interest. The foregoing includes services provided directly or indirectly, as an individual, partnership or corporation, engaged in the business of public accounting or any kind or character.

(2) In the event that any of the aforesaid clients are served, directly or indirectly as aforesaid, by such a terminated partner or principal (jointly and severally hereinafter referred to as "terminee"), such terminee shall be liable as follows:

(a) For payment in full of all fees and expenses, billed or unbilled, due to the Firm from such clients as of the date the Firm learns that the client will be served by the terminee or from the date such client notifies the Firm that it will be served by the terminee.

(b) For reimbursement to the Firm for all direct costs (out-of-pocket expense), paid or to be paid by the Firm in connection with the acquisition of such client including, without limitation, retirement benefit obligations of any predecessor firm.

(c) The aforementioned obligations shall be satisfied as follows:

(i) To the extent of the balance thereof, the amount so due shall be charged against the terminee's capital accounts as of the date of his termination.

(ii) Any balance then due shall be paid by the terminee remitting to the Firm all amounts received by him from such client. Such payment shall be made within ten (10) days from the receipt of such funds.

(iii) If there is any balance still remaining by reason of the billed or unbilled fees and expenses owing by such clients, terminee agrees, on a best efforts basis, to assist the Firm in the collection thereof, including but not limited to full cooperation in a legal collection action. The out-of-pocket expense of any legal action shall be borne by the Firm but the terminee shall not be entitled to any compensation by reason of service so rendered by the terminee.

(iv) If there is any balance still remaining by reason of direct costs in connection with the acquisition of such clients, payment of the amount due shall be made on receipt of the statement furnished as hereinafter provided.

(3) The Policy Board shall take such action as it may deem necessary or appropriate to implement the provisions of this Section, including but not limited to:

(a) Furnishing to the terminee statements setting forth the basis for the charges to the terminee's capital accounts and for any amounts due in excess thereof.

(b) Allocating the aforesaid obligations among the terminees if more than one is involved in serving such clients.

(4) The Policy Board shall have the right to waive any of the provisions of this Section 3 as it may deem necessary or appropriate in any situation.

most immediately after the merger was completed, Sowell became incapacitated with a terminal illness and had to withdraw from the organization entirely. Sowell's withdrawal prompted MH to bring in a partner from its Houston office to be partner in charge. According to Haass' perceptions, the changes he feared from the beginning, such as discrimination against employees from the CJ half of the merger, began to occur. Haass and other key personnel became increasingly disenchanted with MH's policies and procedure. Approximately one year after the merger, Haass and several employees formerly with CJ (Bruce Lindow, Caroline Rawie, and Phil Sagebiel) tendered their resignations. A few days later, Vicki Ravenburg also resigned. Shortly thereafter Haass and the resigning employees opened a new accounting firm, Haass and Company. It is undisputed that the new firm was planned and organized while they were on MH's payroll. Many MH clients who had been served by Haass or one of the other departing accountants then became clients of Haass and Company, some of them almost immediately.

MH sued Haass on the partnership agreement and for violation of his fiduciary duty to MH as a partner. Haass answered with a general denial, specific denials and affirmative defenses, including that the agreement operated in restraint of trade and as a penalty, and was therefore unenforceable. Haass counterclaimed for his capital account.[4] Trial was to a jury which generally found the factual issues favorably for Haass. The amount of damages under the "all direct costs (out of pocket expenses)" connected with MH client acquisitions, as specified in the partnership

agreement,[5] was submitted to the jury and found to be $126,000. The parties stipulated that should Haass prevail with one of his defenses he would receive his capital account. The jury found Haass' reasonable attorneys' fees to be $30,000, and the trial court rendered judgment on the jury verdict for Haass against MH, and that MH take nothing against Haass.

MH appealed the adverse judgment. The court of appeals held that there was no evidence to support the jury findings on Haass' defenses involving disputed facts, and therefore reached the purely legal defense of whether the damages provisions for providing accounting services to MH clients or former clients was a restraint on trade. The court of appeals held that the client acquisition cost provision operated as a restraint of trade and was therefore unenforceable, that the "client reimbursement provision" was reasonable and enforceable, requiring that a portion of the trial court's judgment be reversed and remanded for determination of MH's damages under that provision and attorney's fees,[6] but affirmed the trial court judgment that Haass recover his capital account subject to a $15,000 remittitur of attorneys' fees. 775 S.W.2d at 711. Both parties filed applications for writ of error to this court.

■ MH contends that the damages provision is not a covenant against competition and that it is a reasonable damages provision governed by this court's opinion in *Henshaw v. Kroenecke*, 656 S.W.2d 416 (Tex.1983). MH argues, therefore, that the court of appeals erred in applying the standards of *Hill v. Mobile Auto Trim, Inc.*,

---

4. A capital account is formed by each partner's share of net profits made by the firm in any given year, less the partner's "draws" against the account (usually monthly like salary), in any given year. The account is allowed to accumulate and draw interest.

5. *See* note 3 *supra.*

6. In this court both parties represented in their briefs that § 3(2)(a) of the partnership agreement, providing for payment of billed and unbilled fees and expenses of MH to departing clients, is only a "collection" device or provi-

sion. Both sides agree that MH claims no damages under this provision and there is no issue for determination on a remand as to that provision. Both further profess confusion over the court of appeals opinion's discussion suggesting there are two different damages provisions in dispute, when in fact only one applies. We hold the parties to their representations that the court of appeals judgment is erroneous on this issue and address only the client acquisition cost provision, § 3(2)(b). See footnote 3 *supra* for the relevant text.

725 S.W.2d 168 (Tex.1987), to conclude that the provision is an unreasonable restraint on trade. Haass contends that the provision operates as a noncompetition agreement and that the court of appeals correctly applied *Hill v. Mobile Auto Trim.*

The provisions in question do not expressly prohibit Haass from providing accounting services to clients of MH. Rather, they provide that if he does, Haass must pay as a form of liquidated damages "all direct costs (out-of-pocket expense), paid or to be paid by [MH] in connection with the acquisition of such client including, without limitation, retirement benefit obligations of any predecessor firm." Further, the broad definition of "client" includes not only existing clients but also any party "who became such a client during the twenty–four–(24)–month period" after Haass left and whether or not they were part of the "client base" MH acquired when it merged with CJ.

The treatment of damages provisions similar to the one at issue has been addressed by the courts in a number of jurisdictions. Most courts have analyzed such provisions as restraints on trade sufficiently similar to covenants not to compete to be governed by the same general reasonableness principles in order to be enforceable.[7] Even those courts that have declined to treat such damages provisions as restraints on trade have required them to be reasonable to be enforced.[8] The reasonableness tests adopted by courts declining to treat such damages provisions as restraints on trade may generally be described as whether the restriction is greater than necessary to protect the business and goodwill of the employer, the economic hardship which the covenant imposes on the departing party, and whether the restriction adversely affects the interests of the public. Annotation, *Covenants To Reimburse Former Employer for Lost Business*, 52 A.L.R.4th 139, 142 (1987). We regard these reasonableness tests as essentially indistinguishable from the ones applied to covenants in restraint of trade. We conclude that the view adopted by most courts, that such covenants should be subject to the same standards of reasonableness as covenants not to compete, is the correct one.

There are two further reasons that damages provisions such as the one at issue should be judged by the reasonableness standards for covenants not to compete. The first is the nature of the "breach." Even when there is no express provision that the departing partner or employee is prohibited from competing, the conduct for which damages are assessed is competing by furnishing accounting services to clients of the former business. If the damages provided are sufficiently severe, then the economic penalty's deterrent effect functions as a covenant not to compete as surely as if the agreement expressly stated that the departing member will not compete. The practical and economic reality of such

---

7. *Olliver/Pilcher Ins., Inc. v. Daniels,* 148 Ariz. 530, 531–32, 715 P.2d 1218, 1219–20 (1986); *Rhoads v. Clifton, Gunderson & Co.,* 89 Ill. App.3d 751, 44 Ill.Dec. 914, 411 N.E.2d 1380 (1980); *Holloway v. Faw, Casson & Co.,* 319 Md. 324, 355, 572 A.2d 510, 514–15 (1990); *Phillip G. Johnson & Co. v. Salmen,* 211 Neb. 123, 127–28, 317 N.W.2d 900, 903 (1982); *Smith, Batchelder & Rugg v. Foster,* 119 N.H. 679, 683–84, 406 A.2d 1310, 1312–1313 (1979); *McElreath v. Riquelmy,* 444 S.W.2d 853 (Tex.Civ.App.—Houston [14th Dist.] 1969, no writ); *Foti v. Cook,* 220 Va. 800, 263 S.E.2d 430 (1980); *Perry v. Moran,* 109 Wash.2d 691, 748 P.2d 224 (1987), *modified on other grounds on reconsideration,* 111 Wash.2d 885, 766 P.2d 1096, *cert. denied,* 492 U.S. 911, 109 S.Ct. 3228, 106 L.Ed.2d 577 (1989).

8. *See, e.g., Follmer, Rudzewicz & Co. v. Kosco,* 420 Mich. 394, 408, 362 N.W.2d 676, 683 (1984) ("whether such an agreement is characterized as in restraint of trade or not, it must be reasonable to be enforced"); *Dobbins, DeGuire & Tucker, P.C. v. Rutherford, MacDonald & Olson,* 218 Mont. 392, 708 P.2d 577 (1985) (provision to pay 100% of gross fees billed by former employer accounting firm over the immediate past twelve months preceding termination of employment, not void as a *per se* restraint on trade but remanded for factual determinations of reasonableness in operation under particular conditions); *Isler v. Shuck,* 38 Or.App. 233, 589 P.2d 1180, 1182–83 (1979) ("provisions in issue [payment of 50% of gross fees earned from services performed in the three years after termination by accountant for any client of the company who should transfer his patronage to defendant] do not constitute a covenant not to compete" but "[i]t must be shown to be an unreasonable limitation on the subject's right to engage in his calling.")

a provision is that it inhibits competition virtually the same as a covenant not to compete.

Second, analyzing damages provisions affecting the right to render personal services as covenants not to compete in restraint of trade is consistent with our prior cases. In *Henshaw*, upon which MH relies, we in fact engaged in a two-part analysis. We first addressed the covenant not to compete to determine whether it was a reasonable and therefore enforceable restraint on trade. *Henshaw*, 656 S.W.2d at 418. We then analyzed the damages provision to determine whether it was reasonable as liquidated damages. *Id.* at 419–20. In *Henshaw*, the provision was labeled "COVENANT NOT TO COMPETE" and did include an express agreement not to compete, but provided liquidated damages as the only remedy. *Id.* at 417. Similarly, in *Frankiewicz v. National Comp Associates*, 633 S.W.2d 505 (Tex.1982), which involved a covenant not to compete with provisions for both injunctive relief and loss of renewal commissions as damages, we addressed both remedy provisions as restraints on trade effective as covenants not to compete. We expressly rejected the argument that the damages provision should be considered independently and did not constitute a covenant not to compete because the former agent was free to compete as long as he was willing to forego renewal commissions. *Frankiewicz*, 633 S.W.2d at 507. Thus both *Henshaw* and *Frankiewicz* are consistent with reviewing damages provisions inhibiting the right to render personal services as covenants not to compete in restraint of trade.

Under *Henshaw*, the damages provision is reasonable as a liquidated damages provision. *Henshaw* does not compel the conclusion that the MH provisions are reasonable as covenants not to compete. We must examine the ways the MH provisions go beyond what was held reasonable in *Henshaw*. We first briefly review the reasonableness standards for covenants not to compete.

■ To be reasonable an agreement not to compete must satisfy each of three conditions. First, it must ancillary to an otherwise valid contract, transaction or relationship. *DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 681–82 (Tex.1990); *Justin Belt Co. v. Yost*, 502 S.W.2d 681, 683–84 (Tex. 1973). Second, the restraint created must not be greater than necessary to protect the promisee's legitimate interests such as business goodwill, trade secrets, or other confidential or proprietary information. *DeSantis*, 793 S.W.2d at 682; *Henshaw*, 656 S.W.2d at 418; *Frankiewicz*, 633 S.W.2d at 507; *Weatherford Oil Tool Co. v. Campbell*, 161 Tex. 310, 312–13, 340 S.W.2d 950, 951 (1960). Third, the promisee's need for the protection given by the agreement must not be outweighed by either the hardship to the promisor or any injury likely to the public. *DeSantis*, 793 S.W.2d at 682; *Henshaw*, 656 S.W.2d at 418; *Weatherford Oil Tool*, 161 Tex. at 312, 340 S.W.2d at 951.

■ Haass' participation in the merger agreement was supported by the consideration of his receiving a defined partnership interest in MH and a twenty-month guaranteed income. The provisions in question are ancillary to the otherwise valid merger agreement and thus meet the first test. The relevant reasonableness questions are whether the restraint was not greater than required to protect MH's legitimate interests and MH's need is not outweighed by hardship to Haass or potential damage to the public. We determine these reasonableness questions as a matter of law. *DeSantis*, 793 S.W.2d at 682; *Henshaw*, 656 S.W.2d at 418.

The provision we held reasonable in *Henshaw* defined and limited the term "competition" to the "providing of any similar services to the then clients of the partnership or to those clients who have ceased being clients within the twelve months immediately preceding such termination." The MH definition is far more expansive. It operates prospectively to include clients that become clients after the departing partner has already left the firm. Also, it expressly includes any of MH's clients worldwide, not just those with whom Haass had some actual contact. These aspects of

the provision the court of appeals concluded were unreasonable because they were overbroad, oppressive to Haass because he "would have to, in effect, take a prospective client's accounting history," and injurious to the public by limiting the choice of accountants. 775 S.W.2d at 709–710.

The court of appeals' conclusion is supported by decisions from other jurisdictions. The fundamental legitimate business interest that may be protected by such covenants is in preventing employees or departing partners from using the business contacts and rapport established during the relationship of representing the accounting firm to take the firm's customers with him. *Henshaw*, 656 S.W.2d at 418; *Holloway v. Faw, Casson & Co.*, 319 Md. 324, 354–55, 572 A.2d 510, 515 (1990); Blake, *Employee Agreements Not To Compete*, 73 Harv. L.Rev. 625, 647 (1960). In the context of this accounting firm merger, this protectible fundamental business interest includes preserving the client base that MH acquired by merging with CJ. When the term "client" was left undefined, one court concluded that unless limited to "Miller's personal involvement with former clients" it would be an unreasonable restraint on trade. *Miller v. Williams*, 300 So.2d 752, 756 (Fla.App.1974), *cert. denied*, 314 So.2d 780 (Fla.1975). In *Smith, Batchelder & Rugg v. Foster*, 119 N.H. 679, 406 A.2d 1310 (1979), the court concluded that a similar broad definition of the accounting firm's protected "clients" was unreasonable as broader than necessary to protect legitimate interests and oppressive to the departing accountant and the public, because there was no geographical limitation on the clients protected from competition and it included all clients whether or not they were current clients. In *Singer v. Habif, Arogeti & Wynne, P.C.*, 250 Ga. 376, 297 S.E.2d 473 (1982), the court held it was an unreasonable restraint on trade for a restrictive covenant to prohibit an accountant from accepting or soliciting work from *any* client of his former employer for two reasons: (1) it prohibited accepting any employment from any of the former employer's clients, not just those for whom the accountant had worked, and thus was

overbroad as to the proper protectible interest; and (2) it unreasonably impacted on the accountant's capacity to render professional services and the public's ability to choose an accountant. Earlier, the same court had held that if the provision was not limited to clients whom the employee had served personally as an employee, it was unreasonable and unenforceable. *Fuller v. Kolb*, 238 Ga. 602, 234 S.E.2d 517 (1977). Similarly, in *Polly v. Ray D. Hilderman & Co.*, 225 Neb. 662, 407 N.W.2d 751 (1987), a covenant not to compete which prohibited the accountant-employee from being employed by any of the employer's clients who lived within thirty-five miles of any of the employer's three offices, was held a greater restriction than reasonably necessary and therefore unenforceable since it purported to restrict the accountant-employee from accepting subsequent employment with clients with whom the accountant-employee did not work and whom he did not know while in the employment of the accounting firm. The term "clients" has been held overbroad and unreasonable because it might include persons who first become clients after the employee leaves. *Seach v. Richards, Dieterle & Co.*, 439 N.E.2d 208 (Ind.App.1982).

The conclusions reached in these other jurisdictions are consistent with what we have written on covenants not to compete. They rest on requiring a connection between the personal involvement of the former firm member with the client acquired for reasonableness. In *Weatherford Oil Tool* we approved a quotation from *Wisconsin Ice & Coal Co. v. Lueth*, 213 Wis. 42, 250 N.W. 819, 820 (1933), that "the restrictive covenant must bear some relation to the activities of the employee. It must not restrain his activities into a territory into which his former work has not taken him or given him the opportunity to enjoy undue advantages in later competition with his employer." In *Henshaw* we recognized the same protectible business interest of preventing the former partner or employee from establishing rapport with the clients and upon termination taking part of the client base with him. *Henshaw*,

656 S.W.2d at 418. Inhibiting departing partners from engaging accounting services for clients who were acquired after the partner left, or with whom the accountant had no contact while associated with the firm, does not further and is not reasonably necessary to protect that interest. We hold that the provision is overbroad and unreasonable.

■ As an alternative argument, MH urges that if its contractual provisions are overbroad, then this court should reform the provision to limit them reasonably and then enforce the damages provision. As authority, MH points to provisions of the Covenant Not to Compete Act allowing equitable modification and enforcement. TEX. BUS. & COM.CODE ANN. §§ 15.50–15.51 (Vernon Supp.1990). The legislature enacted the Covenant Not to Compete Act in 1989, with an effective date of August 28, 1989, almost two years after the trial below. Although it did not expressly address litigation pending on appeal, the legislature stated, "This Act applies to a covenant entered into before, on, or after the effective date of this Act." [9] Even if we gave the act the sweeping retroactive effect MH seeks, the reformation argument is invalid because both the legislative intent and a literal application of the statute would not allow MH to collect damages.

MH correctly argues that the purpose of the act was to return Texas' law generally to the common-law as it existed prior to *Hill v. Mobile Auto Trim.*[10] *See The Covenant Not to Compete Act: Hearings on S.B. 946 Before the Senate Comm. on Economic Dev.,* 71st leg. (Apr. 3, 1989). Texas common law prior to *Hill* clearly provided that when the suit was at law for damages, the restrictive provision had to stand or fall as written and could not be reformed to make it reasonable. *DeSantis,* 793 S.W.2d at 682; *Frankiewicz,* 633 S.W.2d at 507; *Weatherford Oil Tool,* 161 Tex. at 314, 340 S.W.2d at 952–53. The legislature may have modified this law be-cause section 15.51(c) allows reformation of a covenant not to compete that "does not meet the criteria specified by Subdivision (2) of Section 15.50" (i.e., contains unreasonable limitations by "impos[ing] a greater restraint than is necessary to protect the goodwill or other business interest of the promisee"). But section 15.51(c) expressly provides that "the court *may not award* the promisee damages for a breach of the covenant before its reformation and the *relief* granted to the promisee *shall be limited to injunctive relief."* (Emphasis supplied.) Since MH obtained no reformation of the covenant before Haass' actions for which it sought damages, the act would *prohibit* MH from obtaining damages. The Covenant Not to Compete Act is of no help to MH.

■ We hold that provisions clearly intended to restrict the right to render personal services are in restraint of trade and must be analyzed for the same standards of reasonableness as covenants not to compete to be enforceable. We hold that the provision in question here is unreasonable because it applies to clients who first become clients after the accountant left the firm or with whom the departing partner had no contact while he was at the prior firm. The court of appeals correctly held the provision in question was an unreasonable restraint on trade. Because the court of appeals judgment partially remanded the cause for a determination on a damages provision the parties concede is irrelevant, we reverse the judgment of that court and affirm the judgment of the trial court as modified by the remittitur of attorney's fees in the court of appeals.

Dissenting opinion by Justice CORNYN joined by Justice GONZALEZ.

CORNYN, Justice, dissenting.

The partner withdrawal provisions of this vigorously negotiated contract between certified public accountants do not, in my view, operate as an unreasonable

---

9. Covenant Not to Compete Act, 71st Leg., R.S., ch. 1193, § 2, 1989 Tex.Gen.Laws 4852.

10. We have determined that the results in *Hill v. Mobile Auto Trim* would have been the same under the common law analysis existing prior to *Hill. DeSantis,* 793 S.W.2d at 683.

restraint on trade insofar as they require Mr. Haass ("Haass") to reimburse Main Hurdman's ("MH") costs in acquiring clients Haass took with him when he left the firm. Moreover, I disagree with the majority's insistence on hammering a square peg into a round hole by the way it treats these contractual withdrawal provisions as a covenant not to compete. Accordingly, I dissent.

I agree with the court of appeals that this is *not* a covenant not to compete since there is no limitation whatsoever on Haass's right to practice the accounting profession. Even Haass concedes in his response to MH's application for writ of error that MH did not require him to sign a covenant not to compete. Therefore, the majority's application of *Hill v. Mobile Auto Trim, Inc.*, 725 S.W.2d 168 (Tex. 1987), to Haass is clearly unwarranted and, in my judgment, paternalistic.

MH's principal interest in the merger was to acquire the client base and good will of an established local accounting firm, Chorpening Jungmann and Company ("CJ"), in the San Antonio area. This being the case, to allow Haass to accept the benefits of his bargain and yet deny MH the benefits of its bargain is baffling. The message the majority sends is that the court will stretch reason and logic to avoid enforcing contracts according to their unequivocal terms when the court, with the benefit of 20–20 hindsight, deems enforcement undesirable for one reason or another. This only injects confusion and uncertainty into commercial relationships based on comprehensive written agreements.

There is no valid reason why parties to the sale of a professional practice should not be able to adopt a formula designed to protect the purchaser from the loss of its bargain when, as here, a partner's withdrawal and the exodus of his clients would clearly frustrate the purchaser's very reasons for purchasing the practice. Clearly, a significant component of what CJ sold to MH was the goodwill established by Haass and his partners. Goodwill has been defined as:

[t]he advantage or benefit which is acquired by an establishment beyond the mere value of the capital stock, funds or property employed therein, in consequence of the general public patronage and encouragement which it receives from the constant and habitual customers on account of its local position, or common celebrity, or reputation for skill, or influence, or punctuality, or from other accidental circumstances or necessities, or even from ancient partialities or prejudices.

*Taormina v. Culicchia*, 355 S.W.2d 569, 573 (Tex.Civ.App.—El Paso 1962, writ ref'd n.r.e.). We have recognized goodwill as a valuable property right. *Texas & Pac. Ry. Co. v. Mercer*, 127 Tex. 220, 90 S.W.2d 557, 560 (Tex.Comm'n.App.1936, opinion adopted). Moreover, the sale of goodwill carries an implied covenant that the seller will do nothing in derogation of that grant. *Casanova v. Falstaff Beer, Inc.*, 304 S.W.2d 207, 212 (Tex.Civ.App.—Eastland 1957, writ ref'd n.r.e.). I would hold that when a firm's goodwill is being sold, a contractual provision such as the one at issue here can be a permissible device with which to estimate the losses to be incurred by MH in the event of Haass's withdrawal from the partnership. Such a provision should be enforced absent extenuating circumstances not present here.

According to the terms of the merger agreement, both parties acquired valuable rights. Haass became a partner in a national accounting firm, his years of service to his former firm were counted toward his retirement eligibility with MH, he received a guaranteed salary exceeding $90,000 per year for 20 months, and MH assumed more than $200,000 of his former partnership's liabilities. The principal asset that MH received in return was CJ's goodwill as manifested by its client base. Indeed, according to the merger agreement, all client files of CJ became property of MH upon the merger. The majority denies MH the benefit of its bargain. In doing so, the majority simply disregards the jury's finding of client acquisition costs as damages based on its erroneous restraint of trade analysis.

On this record, this reimbursement provision for client acquisition costs is not an unreasonable restraint on trade. The key word is "unreasonable." As the RESTATEMENT (SECOND) OF CONTRACTS points out, this is because, "[e]very promise that relates to business dealings or to a professional or other gainful occupation operates as a restraint in the sense that it restricts the promisor's future activity." RESTATEMENT (SECOND) OF CONTRACTS § 186 comment a (1981). Not every promise, however, is an impermissible restraint. Promises imposing restraints that are ancillary to a valid sale of a business, like the merger here, can be a reasonable means of protecting a legitimate interest of the promisee. RESTATEMENT (SECOND) OF CONTRACTS § 188(2)(c) comment f (1981). "[T]he buyer's interest in what he has acquired cannot be effectively realized unless the seller engages not to act so as unreasonably to diminish the value of what he has sold." *Id.* § 188(2)(c) comment b.

The relevant provisions of the merger agreement provide:

*Compensation of [MH] Upon Withdrawal.* Should any of [Haass], MAS or RSJ withdraw or terminate his or her interest in the Firm either voluntarily or involuntarily and thereafter render professional services to Firm Clients (as that term is defined in Article VIII, Section 3 of the Main Hurdman Partnership Agreement), the withdrawing or terminating partner(s) shall compensate the Firm in the manner provided in Article VIII, Section 3 of the Main Hurdman Partnership Agreement.

The partnership agreement (incorporated in the merger agreement) addresses the compensation due to MH under these circumstances as follows:

3. Termination Other Than By Retirement—Payment to Firm

(1) Any partner or principal who terminates or is involuntarily terminated, and in either situation is not entitled to any retirement benefits, and who, during the period of twenty-four months thereafter solicits or furnishes accounting or related services to Firm clients shall compensate the Firm as hereinafter provided. Firm clients shall include any party who was a client of the Firm as of the termination date or became such a client during the twenty-four (24) month period thereafter, or any other party in which such clients are a principal party. The foregoing includes services provided directly or indirectly, as an individual, partnership or corporation, engaged in the business of public accounting or any kind or character.

(2) In the event that any of the aforesaid clients are served, directly, or indirectly as aforesaid, by such terminated partner or principal (jointly and severally hereinafter referred to as "terminee"), such terminee shall be liable as follows:

(a) For payment in full of all fees and expenses, billed or unbilled, due to the Firm from such clients as of the date the Firm learns that the client will be served by the terminee or from the date such client notifies the Firm that it will be served by the terminee.

(b) For reimbursement to the Firm for all direct costs (out-of-pocket expense), paid or to be paid by the Firm in connection with the acquisition of such client including but without limitation, retirement benefit obligations of any predecessor firm.

Provision 2(a) of the partnership agreement merely provides that the accounts receivable which are attributable to Haass's efforts while a member of the partnership belong to MH. The sums due under Part 2(a) are undisputed. Part 2(b) requires him to pay MH their out-of-pocket expenses for acquisition of any firm clients that follow Haass to his new accounting firm, including those acquired by MH in the merger. The principal witness called by MH in support of its claim for client acquisition costs was William B. Sanders, a partner with MH at the time of its merger with CJ. Sanders used CJ's financial records for the fiscal year ending December 31, 1982 for his calculations inasmuch as these were the same records used by MH in calculating the amount MH would pay to merge with CJ. Using CJ's financial records and Haass's client list, Sanders

testified that Haass's clients accounted for 20.82% of the client base acquired by MH in the merger. Applying that figure to MH's costs incurred in the merger, Sanders testified that MH's out-of-pocket client acquisition costs were $749,611.00.

The jury question addressed to part 2(b) of the merger agreement asked: "State from a preponderance of the evidence the amount of money, if any, that would fairly and reasonably compensate Main Hurdman for all direct costs (out-of-pocket expenses) paid or to be paid in connection with the acquisition of its clients that were served by Haass & Co. after August 20, 1984." The jury answered: "$126,000." The court of appeals found that part of the agreement that requires Haass to reimburse MH for clients who were patrons of MH on or before the date of Haass's termination with the firm reasonable. 775 S.W.2d at 709. But the court of appeals declined to enforce the reimbursement provision to the extent a "firm client" is defined as including those who became MH clients during a period of two years after Haass left MH. *Id.* at 710.

First, it is clear that the quoted provisions of the merger and partnership contract do not even attempt to liquidate the damages sustained by MH upon Haass's withdrawal. The relevant provisions do not state an amount of money due MH; this issue is left open for a factual determination after the withdrawal. Nor does the fact that the cost of withdrawing from the partnership was designed to make Haass "think twice" about leaving the partnership make this an impermissible penalty of the sort we forbade in *Stewart v. Basey,* 150 Tex. 666, 245 S.W.2d 484 (1952). These are reimbursement provisions, dependent upon proof of the amount due according to the contract formula.

Second, section 2(b) of the contract, insofar as it requires Haass to reimburse MH for its acquisition cost of firm clients that followed Haass to his new firm, is a reasonable means by which MH protected itself against just what happened here. We have previously acknowledged the legitimate interest of a party under similar circumstances to protect themselves from the possibility a withdrawing partner would "establish a rapport with the client of the business and ... take a segment of that clientele with him." *Henshaw v. Kroenecke,* 656 S.W.2d 416, 418 (Tex.1983). By refusing to enforce the provision of the contract relating to acquisition costs of CJ's clients, MH has paid for the privilege of merging with CJ, but has been denied the those benefits to which it is entitled under its bargain.

On different facts, I would be inclined to hold that only one part of the agreement, that defining firm client to include those who initiate a business relationship in the two years *after* Haass departed, is an unreasonable restraint of trade. As such, under RESTATEMENT (SECOND) OF CONTRACTS § 184 (1981), I would "blue pencil" the agreement to deny enforcement of that which is, from that which is not, unreasonably in restraint of trade. *See* RESTATEMENT (SECOND) OF CONTRACTS § 184 reporter's note (1981) (pointing out that modern authorities favor enforcement of severable provisions of a contract and reject the former rule prohibiting "blue penciling" of the unenforceable provisions from the contract); *see also Hill v. Mobile Auto Trim, Inc.,* 725 S.W.2d 168, 175 (Tex.1987) (Gonzalez, J., dissenting).

But this court does not need to decide whether MH can recover its out-of-pocket client acquisition costs for clients who came and left MH to go with Haass in the two years after he withdrew for the simple reason that MH offered no evidence of, nor was the jury asked to consider, expenses paid for "after-acquired" clients. MH's witness on reimbursement costs calculated the amount owed *based on CJ's clients as of December 31, 1982, the date of the merger.* MH did not offer any evidence on, or seek any recovery for, clients acquired by MH after Haass left who later took their business to Haass.

For the foregoing reasons, I would reverse the judgment of the court of appeals and render judgment in favor of MH.

Justice GONZALEZ joins in this dissent.