**Opinion issued August 23, 2018**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-16-00415-CV

————————————

**RAFAEL ORTEGA, ROSARA INVESTMENTS, LLC, LMMM HOUSTON #50 LTD., AND SOGA INVESTMENTS, LTD., Appellants**

**V.**

**AMIN ABEL, MOHAMAD MUSTAFA, SAEED ABDEL FATAH, IHAB ABOUSHI, HANNA HINNAWI, SAMEERA ABEL, AMY LATIF, JOANN BARGHOUT, SUPER BRAVO, INC., BRAVO RANCH, INC., ABEL, INC., AND HOUSTON BRAVO, INC., Appellees**

---

**On Appeal from the 269th District Court**
**Harris County, Texas**
**Trial Court Case No. 2012-70156**

---

**O P I N I O N**

Rafael Ortega, Rosara Investments, LLC, LMMM Houston #50 Ltd., and

SOGA Investments, Ltd. (collectively, "Ortega") sued Amin Abel, Mohamad

Mustafa, Saeed Abdel Fatah, Ihab Aboushi, Hanna Hinnawi, Sameera Abel, Amy Latif, Joann Barghout, Super Bravo, Inc., Bravo Ranch, Inc., Abel, Inc., and Houston Bravo, Inc. (collectively, "Abel") for breach of a covenant not to compete, tortious interference with the covenant, and conspiracy to interfere with and conceal the breach of the covenant. The jury found in favor of Ortega on each of the claims and awarded damages, including exemplary damages. The trial court granted Abel's motion to reform the covenant and, accordingly, awarded only injunctive relief in the final judgment. In two issues on appeal, Ortega argues the trial court erred by reforming the covenant and by failing to include the jury's damages award in the final judgment.

We affirm.

## Background

Ortega owns two chains of grocery stores: La Michoacana and El Ahorro. In total, he owns 150 stores throughout Texas and Oklahoma. These grocery stores primarily target Hispanic customers. By the time of trial, there were over 70 La Michoacana and El Ahorro stores in Houston, Texas.

On November 7, 2007, Ortega agreed to purchase from Abel five Hispanic grocery stores, called Mi Rancho. Four of the stores were located in Houston. The fifth was located in Carrolton, Texas. As part of the agreement, Abel signed a non-competition agreement. Under the terms of this agreement, Abel agreed that, for a

15-year period, he would not own or operate a Hispanic-themed grocery store[1] within 10 miles of the 5 stores he sold, any La Michoacana or El Ahorro operating at the time of the agreement, or any La Michoacana or El Ahorro operating at the time that Abel attempted to own or operate a new store. In addition, Abel agreed he would not open any Hispanic-themed grocery store in Harris, Fort Bend, Montgomery, Waller, and Galveston counties—even if any such store would be outside the area excluded by the other provisions—without offering Ortega the right of first refusal to partner with Abel in the business.

In late 2012, Ortega sued Abel for breach of the covenant not to compete. Ortega accused Abel of operating four competing Hispanic-themed grocery stores: one in Irving, Texas; one in Oklahoma City, Oklahoma; one in Houston, Texas; and one in Pasadena, Texas. At the end of the trial, the jury found in favor of Ortega and awarded damages, including punitive damages.

Following the trial, Abel filed a motion to modify the covenant not to compete. Abel's motion relied on the testimony of his expert, Rhonda Harper, who testified at trial. Harper has a master's degree in business administration. She has worked for Nabisco Biscuit Corporation, VF Corporation, and Sam's Club. She then

---

[1]     The agreement excludes businesses other than just Hispanic-themed grocery stores. Because no one has challenged on appeal the scope of types of businesses excluded under the agreement, we do not need to identify each excluded business activity for purposes of this opinion.

3

started a consulting business for Fortune 500 companies. As part of her consulting work, she worked with large companies to target more Hispanic customers.

Harper testified that the Hispanic community is fairly diverse, yet certain trends could be identified. She testified that, more often than not, it is a woman doing the shopping, and the woman usually has an additional family member with her. She shops more often than her non-Hispanic counterparts for a slightly larger family and spends more time in a grocery store.

The Hispanic market in Texas is not a niche market, Harper testified. Instead, she refers to it as a dominant market in Texas. As a result, even grocery stores that are not Hispanic-themed still cater to the Hispanic market, including selling Hispanic branded products.

Harper testified that consumers, including Hispanic consumers, travel between 10 to 12 minutes to go the grocery store. "After that, . . . there's no reason to go any farther because they have passed so many stores along the way." She testified, that for quick trips to the grocery store, the travel time reduces. For bigger "nongrocery pick up[s]," most consumers might travel 20 to 30 minutes. She testified that the stores operated by Ortega do not fall into this latter category.

This 10-to-12-minute travel time translates to a 3-to-5-mile range, depending on how rural or urban the location is. The 3-to-5-mile range is not measured by a straight line. Instead, the distance includes the total distance traveled on the road,

including turns in different directions. For more urban locations, like Houston, the 10-to-12-minute range typically only involves a 3-mile drive. "The more densely populated, the trade area gets smaller because it takes more time generally to get to the store," Harper testified.

For the goodwill of the stores sold, Harper testified that goodwill is comprised of corporate reputation and brand equity. She defined "brand equity" as "the amount a consumer or shopper will pay to either shop with you or to buy your item beyond and above what they will pay to shop somewhere else that is nondescript, kind of this baseline." Corporate reputation concerns the perception of the store management, how it operates with its vendors, how it operates within the local community, and how it operates with the larger community.

Harper testified that, when the Mi Ranchos were changed to La Michoacanas or El Ahorros with new management, these changes would have effectively wiped out the stores' previous brand equity and corporate reputation. She testified the goodwill could be recreated, but it would not be the same as it was before.

To protect goodwill, Harper testified that a 10-mile radius around the store would be unreasonably large. A circle with a 10-mile radius contains 330 square miles. Houston, Texas contains about 600 square miles.[2] Harper testified that, on

---

[2] *See* U.S. Census Bureau QuickFacts, https://www.census.gov/quickfacts/fact/table/houstoncitytexas/LND110210#viewtop (last visited Aug. 15, 2018).

average, there are 1,200 homes per square mile in Houston. A 330-square-mile area in Houston, then, includes 396,000 homes. She also testified that there are about 700 other grocery stores within that 10-mile radius.

Harper testified that "about 640 households can support an average-size grocery store."[3] An area with a 3-mile radius in Houston contains about 33,600 households. Harper also testified that a 3-mile radius will also include 50 grocery stores. Fifteen of them are large stores that contain grocery stores, like Target or Walmart. The remaining 35 "are the smaller-format grocery stores." Averaging the total 50 stores against the area households results in 672 households per grocery store.

Harper clarified that, because of competition within and without this radius, a grocery store cannot expect to get 100% of the target clientele. Even so, she testified that, because of the limits on distance people are willing to travel, the area needed to support a grocery store, and the locality tied to the goodwill, a 3-mile radius was "extremely generous" to protect the goodwill of a store.

The trial court granted the motion to reform. In its final judgment, the trial court adjusted the areas where Abel was excluded from competing to a 3-mile radius around the 5 stores that Abel sold to Ortega. The trial court also set the 3-mile radius

---

[3] Harper also testified that a grocery store can support itself with as little as 350 households.

around the 5 stores sold as the area where Abel would have to offer Ortega the right of first refusal.

## Standard of Review

Whether a covenant not to compete is enforceable as written or must be modified to be enforceable is a question of law. *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009); *Butler v. Arrow Mirror & Glass, Inc.*, 51 S.W.3d 787, 792 (Tex. App.—Houston [1st Dist.] 2001, no pet.).

When a question of law has been raised in a full evidentiary hearing, "the trial court frequently must resolve questions of fact before deciding the jurisdiction question." *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002) (disputed issue of personal jurisdiction). In that circumstance, factual disputes are subject to legal and factual sufficiency challenges and conclusions of law are subject to a legal sufficiency challenge. *Id.*; *see also Dale v. Hoschar*, No. 05-13-01135-CV, 2014 WL 3907997, at *1 (Tex. App.—Dallas Aug. 12, 2014, no pet.) (mem. op.) (applying *BMC Software* standard of review to enforceability of covenant not to compete). When, as here, the trial court does not issue findings of fact and conclusions of law, "all facts necessary to support the judgment and supported by the evidence are implied." *BMC Software*, 83 S.W.3d at 795. A party can challenge the implied findings for legal and factual sufficiency, however. *Id.*

When considering whether legally sufficient evidence supports a challenged finding, we must consider the evidence that favors the finding if a reasonable fact finder could, and disregard contrary evidence unless a reasonable fact finder could not. *See City of Keller v. Wilson,* 168 S.W.3d 802, 827 (Tex. 2005). We view the evidence in the light most favorable to the trial court's findings and indulge every reasonable inference to support them. *Id.* at 822. We may not sustain a legal sufficiency, or "no evidence," point unless the record demonstrates (1) a complete absence of evidence of a vital fact; (2) that the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) that the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) that the evidence conclusively establishes the opposite of the vital fact. *Id.* at 810.

In a factual sufficiency review, we consider and weigh all of the evidence. *See Cain v. Bain,* 709 S.W.2d 175, 176 (Tex. 1986); *Arias v. Brookstone, L.P.,* 265 S.W.3d 459, 468 (Tex. App.—Houston [1st Dist.] 2007, pet. denied). When the appellant challenges an adverse finding on an issue on which it did not have the burden of proof at trial, we set aside the verdict only if the evidence supporting the finding is so weak as to make the verdict clearly wrong and manifestly unjust. *See Cain,* 709 S.W.2d at 176; *Reliant Energy Servs., Inc. v. Cotton Valley Compression, L.L.C.,* 336 S.W.3d 764, 782 (Tex. App.—Houston [1st Dist.] 2011, no pet.).

In this situation, the trial court was the sole judge of the credibility of witnesses and the weight to be given to their testimony. *See BMC Software*, 83 S.W.3d at 795 (recognizing responsibility for trial court to resolve questions of fact before ruling on questions of law); *Choice! Power, L.P. v. Feeley*, 501 S.W.3d 199, 208 (Tex. App.—Houston [1st Dist.] 2016, no pet.) (holding, when it acts as fact finder, trial court is sole judge of credibility of witnesses and weight to be given to testimony). As long as the evidence at trial "would enable reasonable and fair-minded people to differ in their conclusions," we will not substitute our judgment for that of the fact finder. *City of Keller,* 168 S.W.3d at 822.

**Analysis**

To be enforceable, a covenant not to compete must be ancillary to an otherwise enforceable agreement and its limitations as to time, geographical area, and scope of activity must be reasonable. TEX. BUS. & COM. CODE ANN. § 15.50(a) (West 2011). To be reasonable, the limitations on trade cannot "impose a greater restraint than is necessary to protect the goodwill or other business interest of the promisee." *Id.* If a covenant not to compete is not reasonable, the trial court must reform it to the extent necessary to make it reasonable. TEX. BUS. & COM. CODE ANN. § 15.51(c) (West 2011). Once it reforms a covenant not to compete, the trial court cannot award damages for injuries incurred from violation of the covenant before it was reformed. *Id.* For the sale of a business, the promisor—in this case,

9

Abel—carries the burden of proving that the covenant is unreasonable. *Id.* § 15.51(b).

In this appeal, the parties do not dispute that the covenant was ancillary to an otherwise enforceable agreement or that the time restrictions and scope of activity restrained are reasonable. In addition, the trial court's modifications to the covenant concerned only the covenant's geographical limitations. Accordingly, our review is limited to whether Abel carried his burden of proving that the covenant's geographical limitations were unreasonable. *See id.* §§ 15.50(a), .51(b).

## A. Right of First Refusal

As a part of his first issue, Ortega argues that one of the provisions the trial court modified was not a restraint on trade. Accordingly, Ortega argues, the trial court lacked the authority to modify its terms. The provision in question, as originally drafted, prevented Abel from opening any Hispanic-themed grocery store in Harris, Fort Bend, Montgomery, Waller, and Galveston counties—even if any such store would be outside the area excluded by the other provisions—without offering Ortega the right of first refusal to partner with Abel in the business. This provision lasted for the same 15-year period applied to the other provisions that Ortega acknowledges acts as a restraint on trade.

Not every provision in a covenant not to compete is governed by sections 15.50 and 15.51 of the Texas Business and Commerce Code. *See Marsh USA Inc.*

10

*v. Cook*, 354 S.W.3d 764, 768 (Tex. 2011) (holding provisions preventing disclosure of trade secrets and confidential information are not expressly governed by Covenants Not to Compete Act).  Accordingly, to be governed by these sections, a provision must function as a restraint on trade.  *See* TEX. BUS. & COM. CODE ANN. § 15.50(a).  Chapter 15 of the Texas Business and Commerce Code defines "trade," in pertinent part, as "the sale, purchase, lease, exchange, or distribution of any goods or services . . . and all other economic activity undertaken in whole or in part for the purpose of financial gain."  TEX. BUS. & COM. CODE ANN. § 15.03(5) (West 2011).  A contract provision does not have to function as a complete prohibition on trade in order to be a restraint on trade.  *See Valley Diagnostic Clinic, P.A. v. Dougherty*, 287 S.W.3d 151, 155 (Tex. App.—Corpus Christi 2009, no pet.) (citing *Peat Marwick Main & Co. v. Haass*, 818 S.W.2d 381, 383 (Tex. 1991) and holding forfeiture clause functioned as restraint on trade and, accordingly, was governed by non-compete statutes).

The provision in question prohibited Abel from owning or operating a Hispanic-themed grocery store without first offering Ortega the right to be a partner in the business.  Owning or operating a grocery store is an "economic activity undertaken in whole or in part for the purpose of financial gain."  *See* TEX. BUS. & COM. CODE ANN. § 15.03(5).  Prohibiting Abel from owning or operating a grocery store in a defined area for a defined time unless he offered Ortega the right to be a

11

partner in the business is a restraint on that trade. *See Valley Diagnostic*, 287 S.W.3d at 155.

We overrule this part of Ortega's first issue.

## B. Geographic Restrictions

In the remainder of his first issue, Ortega argues that Abel did not prove that the geographic restraints in the covenant were unreasonable. Under the original terms of the covenant not to compete, Abel agreed that, for a 15-year period, he would not own or operate a Hispanic-themed grocery store within 10 miles of the 5 stores he sold, any La Michoacana or El Ahorro operating at the time of the agreement, or any La Michoacana or El Ahorro operating at the time that Abel attempted to own or operate a new store. Abel also agreed he would not open any Hispanic-themed grocery store in Harris, Fort Bend, Montgomery, Waller, and Galveston counties—even if any such store would be outside the area excluded by the other provisions—without offering Ortega the right of first refusal to partner with Abel in the business. Ortega challenges the trial court's ruling reducing the non-competition and right-of-first-refusal radius to 3 miles and allowing the radius to only be around the 5 stores sold.

### 1. Reducing the Radius

Harper testified that it was not reasonable to impose a 10-mile radius around the five stores sold, all La Michoacanas or El Ahorros operating at the time of the

12

agreement, and all La Michoacanas or El Ahorros operating at the time that Abel attempted to own or operate a new store. A single 10-mile radius contains 330 miles, a little over half the size of Houston. An exhibit presented at trial showed that 10-mile non-compete radiuses around each of Ortega's stores in Houston created a non-compete area around all of Houston, Katy, Sugar Land, Pearland, La Porte, Spring, and many other surrounding cities. This does not take into account all of Ortega's stores in north Texas and Oklahoma.

Harper testified that, once a grocery store changes its name and management team, much of the existing goodwill is lost. As a result, Ortega would have to work to rebuild the goodwill for each of the stores sold. Harper testified that a 3-mile radius around those 5 stores would be more than sufficient. She testified that people rarely travel more than 10 to 12 minutes to go to the grocery store. In cities like Houston, this 10-to-12-minute travel time amounts to a 3-mile drive. This drive includes turning onto different streets, so the drive is rarely a straight, 3-mile line. As a result, a circle with a 3-mile radius would be more than sufficient to cover the 3-mile-drive threshold.

Harper also testified that "about 640 households can support an average-size grocery store." Her testimony established that an area with a 3-mile radius in Houston contains about 33,600 households. Harper also testified that a 3-mile radius

13

will also include 50 grocery stores. Averaging the total 50 stores against the area households results in 672 households per grocery store.

Ortega argues that Harper's testimony actually establishes that the 10-mile radius is justified. Ortega asserts that Harper testified that people will drive 5 miles for some stores. Ortega further reasons that each store will have a 5-mile radius to protect. Accordingly, Ortega argues, a 10-mile radius is justified.

This reasoning is flawed for a couple of reasons. First, Harper's testimony that Ortega cites as proof of the 5-mile radius is her testimony that "the Hispanic shopper will drive a little bit farther than the non-Hispanic shopper to a Walmart or a Sam's Club, so to a larger format store. Not much but a little bit." This explained why she testified that people will travel up to 5 miles in some circumstances. Harper also testified, however, that Ortega's stores did not fall into the "larger format store" category. This is not a distance, then, that Ortega can rely on to justify the zone of protection around each of his stores.

Second, Harper's testimony does not establish any justification for doubling the radius to create a non-compete area. The goal of a covenant not to compete is to establish the restraints on trade *reasonably* necessary to protect the goodwill or other business interest of the promisee, not to prevent *any* competition. *See* TEX. BUS. & COM. CODE ANN. § 15.50(a). As Harper's testimony established, a 3-mile radius in Houston will contain about 50 grocery stores. These 50 stores do not all compete

for the exact same pool of customers, but there can be considerable overlap. Harper's testimony established, then, that a 3-mile radius is sufficient when there are other stores in the area competing for varying amounts of the same pool of customers. Accordingly, her testimony does not justify doubling the radius for excluding competition by Abel.

## 2.     Reducing the Stores Protected

Ortega argues that Harper's testimony did not justify applying the 3-mile radius to only the 5 stores sold. To the contrary, Harper testified that, once the stores that were sold changed names and management, there would be a time where most of the goodwill would be lost and have to be recreated. This established the need to create a zone of non-competition around those stores. Harper testified it was not reasonably necessary to protect Ortega's business interest to create a zone of non-competition around every store Ortega owned or would own within the 15-year period of non-competition.

Ortega did not present any proof to contradict Harper's testimony that a zone of protection around the 5 stores sold was all that was reasonably needed to protect Ortega's interest. To the contrary, Ortega testified at trial that the goal of the covenant not to compete was to protect the large investment in buying Abel's stores. Likewise, the covenant not to compete identifies Abel's knowledge of the Hispanic-themed grocery store market as a risk to "the ability of [Ortega] to derive the benefit

15

or value for which [he] bargained" in the purchase of Abel's stores. Finally, Ortega recognized in his response to the motion to modify the covenant that the goal of the covenant was to protect the goodwill received by him from the sale. Harper testified that this investment could be protected by establishing a 3-mile non-compete zone around the 5 stores sold.

Along these same lines, Ortega argues that it is necessary to place a zone of protection around all of his stores because "anything that diminishes one El Ahorro store diminishes all El Ahorro stores, and anything that diminishes one La Michoacana store diminishes all La Michoacana stores." There is no evidentiary support for this theory in the record.

We hold there is legally and factually sufficient evidence to support the trial court's determination that the geographical area restricted in the original covenant not to compete was not reasonable and imposed a greater restraint than was

necessary to protect Ortega's goodwill and other business interests.[4]  *See* TEX. BUS. & COM. CODE ANN. § 15.50(a).  We overrule the remainder of Ortega's first issue.[5]

## Conclusion

We affirm the judgment of the trial court.


Laura Carter Higley
Justice

Panel consists of Justices Higley, Massengale, and Lloyd.

Justice Lloyd, dissenting from the judgment.

---

[4]  The dissent would hold that Abel failed to carry his burden of showing the geographical restrictions were unreasonable.  The dissent concludes, "The jury heard this evidence and the defense used it in their argument on damages. We can infer from the verdict that the jury was unmoved by this testimony. I agree with the jury."  Being a question of law, the reasonableness of the geographical restrictions was never before the jury. *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009) (holding whether covenant not to compete is enforceable as written is question of law for courts).  The trial court was the first to consider the enforceability of the covenant.  The trial court found the covenant unenforceable, which we uphold.

[5]  Ortega's second issue—arguing that, because the original terms of the covenant not to compete were reasonable, the trial court should have included the jury's damages awards in the judgment—is contingent on our sustaining his first issue. *See* TEX. BUS. & COM. CODE ANN. § 15.51(c) (West 2011) (precluding award of damages incurred before covenant not to compete is reformed).  Because we have not sustained the first issue, we do not reach Ortega's second issue. *See* TEX. R. APP. P. 47.1.

17