In The



Court of Appeals



Ninth District of Texas at Beaumont



____________________



NO. 09-08-137 CV


____________________



CHAD POOLE and TERRY FENDLEY, Appellants



V.



U.S. MONEY RESERVE, INC. d/b/a 


UNITED STATES RARE COIN & BULLION RESERVE, Appellee






On Appeal from the 58th District Court 


Jefferson County, Texas


Trial Cause No. A-180,741






MEMORANDUM OPINION


 Appellants, Chad Poole and Terry Fendley, filed this interlocutory appeal after the
trial court issued a temporary injunction prohibiting them from subsequent employment in
the gold coin industry for a period of three years. See Tex. Civ. Prac. & Rem. Code Ann.
§ 51.014(a)(4) (Vernon 2008). We hold that, while the trial court did not abuse its discretion
in granting a temporary injunction to preserve the status quo, it did abuse its discretion in
crafting the temporary injunction order. We declare the temporary injunction order void and
dissolve the order because it is overly broad and fails to comply with Rule 683 of the Texas
Rules of Civil Procedure. Tex. R. Civ. P. 683.

FACTUAL AND PROCEDURAL BACKGROUND


 U.S. Money Reserve, Inc. d/b/a United States Rare Coin & Bullion Reserve ("U.S.
Money Reserve") filed suit against a group of former employees, including appellants, Chad
Poole and Terry Fendley, alleging that appellants orchestrated a conspiracy to defraud U.S.
Money Reserve and its customers. U.S. Money Reserve alleged specifically that defendants
worked together to divert sales of coins from customers of U.S. Money Reserve and set up
a scheme to abscond customer leads and divert sales to other defendant companies. The
petition alleged that defendants received cash payments for diverting sales to the other
companies. The petition sought among other remedies, a temporary restraining order,
temporary injunction, and permanent injunctive relief. The petition asserted that the acts of
defendants constituted violations of the Deceptive Trade Practices Act as well as a breach
of the employment agreement signed by defendant-employees. U.S. Money Reserve further
alleged tortious interference with its business relationships and misappropriation of trade
secrets. 

 The trial court entered a temporary injunction on February 22, 2008, preventing Poole 
and Fendley (1) from soliciting existing or potential clients of U.S. Money Reserve or otherwise
engaging in any similar business in the United States through January 25, 2011. The
Temporary Injunction states in part that Poole and Fendley:

 shall not call upon, solicit, divert, take away, and/or attempt to call upon,
solicit, divert, or take away any existing or potential clients, customers,
suppliers, businesses, and/or accounts of U.S. Money Reserve, Inc. d/b/a
United States Rare Coin & Bullion Reserve (hereinafter referred to as 
"Company") in connection with any business similar or related to the business
in the United States, nor will Defendant[s] . . . interfere or compete with the
Company in connection with such clients, customers, suppliers, businesses,
and accounts in the United States before 01/25/2011.


The Order further provides:


 Defendant[s] . . . shall not solicit the hiring of any present or future salesman
or consultant of the Company before 01/25/2011.


 Defendant[s] . . . shall not engage in, or give any advice to any person, firm,
partnership, associations, corporation, and/or other entity engaged in a
business similar to or related to the business of the Company or any portion
thereof in the United States before 01/25/2011.


 Defendant[s] . . . shall not lend credit, money, or reputation for the purpose of
establishing or operating a business similar or related to the business of the
Company or any portion thereof in the United States before 01/25/2011.


 Fendley and Poole contend in three issues that the trial court abused it discretion 1)
in reaching the implied finding that U.S. Money Reserve had a probable right to the relief
sought; 2) by entering a temporary injunction that was overbroad; and 3) in reaching the
implied finding that U.S. Money Reserve would suffer a probable, imminent, and irreparable
injury. Appellants argue in conjunction with their third issue that the trial court's order
granting the temporary injunction is void because it fails to comply with Rule 683 of the
Texas Rules of Civil Procedure. 

STANDARD OF REVIEW


 "A temporary injunction is an extraordinary remedy and does not issue as a matter of
right." Butnaru v. Ford Motor Co., 84 S.W.3d 198, 204 (Tex. 2002) (citing Walling v.
Metcalfe, 863 S.W.2d 56, 57 (Tex. 1993)). Its purpose is to preserve the status quo of the
litigation's subject matter pending a trial on the merits. Wright v. Sport Supply Group, Inc.,
137 S.W.3d 289, 292 (Tex. App.--Beaumont 2004, no pet.) (citing Butnaru, 84 S.W.3d at
204). "The decision to grant or deny a temporary injunction lies in the sound discretion of
the trial court, and the court's grant or denial is subject to reversal only for a clear abuse of
that discretion." CRC-Evans Pipeline Int'l, Inc. v. Myers, 927 S.W.2d 259, 262 (Tex. App.--Houston [1st Dist.] 1996, no writ) (citing Walling, 863 S.W.2d at 58).

 Likewise, we review only the trial court's exercise of discretion in determining
whether U.S. Money Reserve showed a probability of success on the merits at trial and that
it would suffer imminent, irreparable injury if the temporary injunction were not granted. 
Tom James of Dallas, Inc. v. Cobb, 109 S.W.3d 877, 882-83 (Tex. App.--Dallas 2003, no
pet.). "In making that determination on appeal, we do not substitute our judgment for that
of the trial court, but determine only whether the court's action was so arbitrary as to exceed
the bounds of reasonable discretion." Id. at 883. "[W]e must view the evidence in the light
most favorable to the trial court's order, indulging every reasonable inference in its favor .
. . ." IAC, Ltd. v. Bell Helicopter Textron, Inc., 160 S.W.3d 191, 196 (Tex. App.--Fort Worth
2005, no pet.). "When the trial court bases its decision on conflicting evidence, there is no
abuse of discretion." Tom James, 109 S.W.3d at 883. A trial court 


 abuses its discretion when it misapplies the law to established facts or when
the evidence does not reasonably support the trial court's determination of the
existence of probable injury or probable right of recovery. We review de novo
any determinations on questions of law the trial court made in support of its
order. However, we only review the trial court's decision on the issues before
the court.


Id. (citations omitted). We recognize that the trial court's order is "based on the record
presented at the temporary injunction hearing." Id. at 885. "We will not assume that the
evidence taken at a preliminary hearing will be the same as the evidence developed at a full
trial on the merits." Id. Thus, our review of the trial court's order is limited to whether the
trial judge abused its discretion in granting the temporary injunction on the record before it. 
Id.

PROBABLE RIGHT TO RELIEF SOUGHT 


 "To obtain a temporary injunction, an applicant must plead and prove three specific
elements (1) a cause of action against the defendant; (2) a probable right to the relief sought;
and (3) a probable, imminent, and irreparable injury before trial." Wright, 137 S.W.3d at
292. The first element is not disputed. Appellants contend that the trial court erred in
impliedly finding that a probable right to relief existed and in entering the temporary
injunction. Specifically, appellants contend that the covenant not to compete is overbroad
in that it contains an industry-wide exclusion preventing appellants from calling upon or
soliciting any existing or potential clients within the United States and prevents appellants
from engaging in any business similar to or related to the business of U.S. Money Reserve
throughout the United States.

 An interlocutory appeal from "an order granting or denying a temporary injunction
based on a convenant not to compete does not present for appellate review the ultimate
question of whether the covenant is enforceable under section 15.50 of the [Texas] business
and commerce code." Tom James, 109 S.W.3d at 882-83 (citing Tex. Bus. & Com. Code
Ann. § 15.50 (Vernon 2002)). We will only address the enforceability of those provisions
insofar as it affects our analysis of whether the elements required for issuance of a temporary
injunction have been satisfied. See id. at 883-85. The employment agreements which
contain the covenants at issue in this lawsuit provide as follows:

 15. Unauthorized Competition Prohibited. The Employee expressly agrees
that the Employee shall not, for a period of five (5) years after termination of
the Association or employment between Employer and Employee, without
prior written consent of the Employer, directly or indirectly through any
corporation, organization or entity owned or controlled by the Employee, or as
principal, agent, joint venture, employee, employer, consultant, partner, stock
holder or holder of any equity or security . . ., in any other individual,
representative or corporate capacity whatsoever:


 a) Call upon, contact, solicit, divert, take away, or attempt to call upon,
contact, solicit, divert or take away any existing or potential clients,
customers, suppliers, businesses, or accounts of the Employer in
connection with any business similar or related to the business within
the above defined geographical area; nor will the Employee interfere
with or compete with the Employer in connection with such clients,
customers, suppliers, businesses, and accounts in the geographical area. 
The term client or customer as referenced in this covenant
includes: (1) any clients or customers for whom Employer provided
services at any time during Employee's employment with Employer;
and (2) any prospective clients or customers to whom Employer had
submitted a proposal for services as of the effective date of Employee's
termination of employment with Employer.


 b) Solicit for hiring, or hire, any past, present or future employee, agent,
representative or consultant of the Employer.


 c) Engage in, or give any advice to any person, firm, partnership,
associations, corporation, or other entity engaged in a business similar
to or related to the business of the Employer or any portion thereof
in the geographical area.


 d) Lend credit, money, or reputation for the purpose of establishing or
operating a business similar to the business, or any portion thereof, of
the Employer in the geographical area.


 e) Accept employment or pay from any person, firm, operation,
partnership, association, or any other entity engaged in a business
similar to or related to the business of the Employer anywhere
within the United States, United Kingdom and Canada. This
provision specifically includes existing competitors of the Employer,
and any potential, future competitors of Employer. This provision also
specifically prohibits Employee from forming a competitive Employer
or organization as an owner, sole proprietor, partner, joint venturer (or
in any other ownership capacity) competing against Employer. 
Similarly, this provision specifically prohibits Employee from getting
or giving any advice, knowledge or information from or to any person,
firm, partnership, association, corporation, or other entity engaged in a
business similar to or related to the business of Employer or any portion
thereof, within the United Kingdom, Canada or the United States.


 f) It is expressly agreed, stipulated and understood by the Employee that
the services of the Employer have been and are currently being
marketed and sold in the geographical area described above, and it is
the Employer's intent to continue to expand the marketability of its
services and products. Accordingly, these covenants are intended to
restrict the Employee from competing in any manner with the
Employer in the activities, which have heretofore been carried on,
by the Employee or any portion thereof or any activities similar or
related thereto within the geographical area . . . . 

(Emphasis added). (2) The geographical area is not specifically defined in the agreements of
Poole and Fendley, however, at the hearing Poole and Dean Liepsner, C.E.O of U.S. Money
Reserve, testified the geographic area encompassed the entire United States. This is
consistent with both the trial court's order and the terms of the restrictive covenants. 

 Appellants contend that because the covenant contains an industry-wide exclusion it
is overbroad and unenforceable and does not give rise to a probable right to the relief sought. 
Appellants further contend that because the trial court's order implements the industry-wide
exclusion set forth in the restrictive covenants, it is likewise overbroad and unenforceable. 
While we do not undertake to consider the ultimate issue of whether the covenant is
enforceable under current law, we hold, based on the facts established by the record, that the
trial court abused its discretion in enjoining appellants from engaging in any subsequent
employment in that industry throughout the United States.

 U.S. Money Reserve argues that this case is governed by Alex Sheshunoff
Management Services, L.P. v. Johnson, 209 S.W.3d 644 (Tex. 2006), while appellants
contend it is governed by Peat Marwick Main & Co. v. Haass, 818 S.W.2d 381 (Tex. 1991)
and Wright, 137 S.W.3d at 289. The parties argued the enforceability of the covenants not
to compete at the temporary injunction hearing. "The enforceability of a covenant not to
compete . . . is a question of law for the court." Light v. Centel Cellular Co. of Tex., 883
S.W.2d 642, 644 (Tex. 1994). Our analysis merits a discussion of the cases cited by both
parties.

 Section 15.50(a) of the Texas Business & Commerce Code provides that 

 a covenant not to compete is enforceable if it is ancillary to or part of an
otherwise enforceable agreement at the time the agreement is made to the
extent that it contains limitations as to time, geographical area, and scope of
activity to be restrained that are reasonable and do not impose a greater
restraint than is necessary to protect the goodwill or other business interest of
the promisee. 

 

Additionally, section 15.51(b) provides that "[i]f the primary purpose of the agreement to
which the covenant is ancillary is to obligate the promisor to render personal services, for a
term or at will, the promisee has the burden of establishing that the covenant meets the
criteria specified by Section 15.50. . . ." Id. § 15.51(b) (Vernon 2002). 

 In Haass, the Texas Supreme Court held that "a damages provision affecting the right
to render personal services operates as a restraint of trade and must be judged by the
reasonableness standards for covenants not to compete[.]" Haass, 818 S.W.2d at 382. The
underlying dispute in Haass began with the merger of two accounting firms, CJ and MH. 
Id. The Court recognized that the relevant reasonableness questions with respect to the
contractual provision at issue were whether the restraint imposed by the provision was
greater than required to protect MH's legitimate interests and whether MH's need 
outweighed the hardship to Haass or the damage to the public. Id. at 386. The Court in
Haass found significant that the contract provisions operated prospectively to include clients
that became clients after the departing partner had already left the firm. Id. In addition, the
provision also expressly included any of MH's clients worldwide, not just those with whom
Haass had some actual contact. Id. The Court stated,

 These aspects of the provision the court of appeals concluded were
unreasonable because they were overbroad, oppressive to Haass because he
"would have to, in effect, take a prospective client's accounting history," and
injurious to the public by limiting the choice of accountants.


 The court of appeals' conclusion is supported by decisions from other
jurisdictions. The fundamental legitimate business interest that may be
protected by such covenants is in preventing employees or departing partners
from using the business contacts and rapport established during the
relationship of representing the accounting firm to take the firm's customers
with him.


Id. at 386-87 (citations omitted). 

 The Court concluded that in the context of the accounting firm merger at the center
of dispute in Haass, the protectible fundamental business interest included preserving the
client base that MH acquired by merging with CJ. Id. at 387. The Court recognized that in
order to meet the reasonableness standard there should be a "connection between the personal
involvement of the former firm member with the client." Id. The Court stated that
"[i]nhibiting departing partners from engaging accounting services for clients who were
acquired after the partner left, or with whom the accountant had no contact while associated
with the firm, does not further and is not reasonably necessary to protect" the relevant
business interest. Id. at 388. Therefore, the Court held the provision was "overbroad and
unreasonable." Id. Notably, Haass was not a case involving a review of the trial court's
grant of a temporary injunction; however, our decision in Wright was such a case. See
Wright, 137 S.W.3d at 291.

 In Wright, we considered whether the trial court abused its discretion in entering a
temporary injunction to enforce a covenant, which like the restrictive covenant in the present
case, contained an industry-wide exclusion, prohibiting the former employee from engaging
in any sales activities in any related business across several counties. See id. Specifically, 
the agreement prohibited Wright, a former salesman for Sport Supply Group, Inc. ("SSG") 
from, "either directly or indirectly, conducting any sales related activities for a business
related to the promotion, marketing, distribution, manufacturing, sourcing, importing and/or
sale of sports related equipment and/or supplies to institutional customers" in twenty-nine
counties. Wright, 137 S.W.3d at 291, 298. The agreement further prohibited Wright from
doing business with the "customers, suppliers, clients, licensors, licensees, distributors,
dealers, or independent salespersons of SSG, or any [of] its affiliates" that conducted
business in Wright's sales district. Id. at 298.

 In Wright we stated that "[a] restrictive covenant is unreasonable unless it bears some
relation to the activities of the employee." Id. (citing Haass, 818 S.W.2d at 386-87). 
Additionally, we recognized that "[a] covenant not to compete that contains an industry-wide
exclusion from subsequent employment is unenforceable." Id. (citing John R. Ray & Sons,
Inc. v. Stroman, 923 S.W.2d 80, 85 (Tex. App.--Houston [14th Dist.] 1996, writ denied)). 
Further, we stated, "a covenant not to compete that extends to clients with whom a salesman
had no dealings during his employment is unenforceable." Id. We held the covenants at
issue were unreasonable restraints of trade because they did not limit the prohibitions to
customers with whom Wright had dealings while he was employed by SSG. Id.
Consequently, we held that the trial court abused its discretion by granting the temporary
injunction. Id.

 In Sheshunoff, the Texas Supreme Court addressed the enforceability of a restrictive
covenant with no geographic restriction that prohibited a former employee, Kenneth Johnson
("Johnson") from providing consulting services to any former customers of his former
employer, Alex Sheshunoff Management Services, L.P. ("ASM"), or from soliciting any
affiliation member or previously identified prospective client or affiliation member. 
Sheshunoff, 209 S.W.3d at 646-47. ASM provided consulting services to banks and other
financial institutions. Id. Johnson was the director of the company's "Affiliation Program,"
a program designed to maintain relationships with clients and prospective clients. Id. A few
months after being promoted to director of the affiliation program, Johnson signed an
employment agreement, which he was told was a condition of his continued employment. 
Id. The agreement provided in pertinent part:

 (a) In consideration of the training and access to Confidential
Information provided by Employer . . . for a period of one (1) year following
the termination of Employee's employment for any reason, Employee will not


 (i) directly or indirectly, as an owner, employee, independent contractor
or otherwise, provide consulting services to banks, savings and loans or other
financial institutions where the Employee has provided fee based services in
excess of 40 hours within the last year of employment, or with which
Employee has conducted significant sales activity, including, but not limited
to, more than one sales call, preparation of a sales proposal and actual sales,
within the last year of employment. This restriction applies regardless of
geographic location, it being acknowledged by the parties that Employer's
clients are not confined to a particular geographic area;


 (ii) solicit or aid any other party in soliciting any affiliation member or
previously identified prospective client or affiliation member; or


 . . . .


 (b) Employee understands and acknowledges that Employer has made
substantial investments to develop its business interests and goodwill, and to provide
special training to Employee for the performance of Employee's duties under this
Agreement. Employee agrees that the limitations as to time, geographical area, and
scope of activity to be restrained contained in this Paragraph 6 are reasonable and are
not greater than necessary to protect the goodwill or other business interests of
Employer. 


Id. at 656. 

 ASM brought an action to enforce the agreement after Johnson left and went to a
competitor, Strunk & Associates, L.P. ("Strunk"). Id. at 647. Johnson argued that the
covenant was overbroad because 1) its restriction on his solicitation of certain ASM's
prospective clients and "affiliation members" was unrelated to any training or confidential
information he received; 2) ASM's protection of its goodwill was unrelated to any such
information; and 3) there was no basis for restricting Johnson from calling on ASM's clients
of whom he was aware before signing the agreement. Id. at 657. The Court disagreed noting
that with Johnson's help, as director of affiliation, ASM continued to develop clients for four
years after the agreement was signed. Id. In addition, Johnson helped develop ASM's
goodwill and could have tried to unfairly capitalize on it after going to Strunk. Id. 

 The Court found significant that Johnson was privy to ASM's development of an
overdraft protection product, while Strunk was the market leader for such products. Id. at
647, 657. The Court noted that the record established that the covenant would have
prevented Johnson from calling on 821 ASM clients for one year. Id. at 657. Finally, the
Court took into consideration the fact that Johnson had admitted in his agreement that his
covenant with ASM was reasonable (3) and had testified that "[w]hen [he] began work with
Strunk, he agreed he would not sell an overdraft protection product . . . to anyone in the
industry . . . for two years after leaving Strunk's employment," which Johnson further
testified was reasonable. Id. The Court concluded the covenant in Johnson's agreement with
ASM was reasonable. Id.

 Sheshunoff is distinguishable from the present case in that while ASM's restrictive
covenant contained no geographic limitation, it only prevented Johnson from soliciting prior
clients with whom he had personal contact or any "previously identified prospective client
or affiliation member." Id. at 647. Here, in addition to preventing Poole or Fendley from
contacting existing and potential clients, the temporary injunction order prevents Poole and
Fendley from engaging in any similar or related business, in any capacity. Moreover,
Johnson's job duties specifically involved client development and maintaining relationships
with prospective clients. Therefore, the restrictions in the covenant were directly related to
Johnson's activities as an employee of the company. Like the defendant-employees in Haass
and Wright, Poole and Fendley were salesmen. The law is well settled in Texas that "[i]n the
case of covenants applied to a personal services occupation, such as that of a salesman, a
restraint on client solicitation is overbroad and unreasonable when it extends to clients with
whom the employee had no dealings during his [or her] employment." Stroman, 923 S.W.2d
at 85 (citing Haass, 818 S.W.2d at 386-88; Daytona Group of Tex., Inc. v. Smith, 800 S.W.2d
285, 288 (Tex. App.--Corpus Christi 1990, writ denied)). As the Court stated in Haass, there
should be a connection between the personal involvement of the former employee and the
client. Haass, 818 S.W.2d at 387. The Court's subsequent decision in Sheshunoff did not
change the law in this regard. (4)

 U.S. Money Reserve argues that the court's order is reasonable based on the express
provisions of the covenant wherein the employees acknowledged "that the limitations as to
time, geographic area, and scope of activity to be restrained are reasonable . . . ." The Court
in Sheshunoff analyzed the reasonableness of a covenant which included virtually identical
language. Sheshunoff, 209 S.W.3d at 656. Notably, while the Court considered the language
in making its determination, the language alone was not outcome determinative. See id. at
657. Likewise, this court addressed an agreement in Wright which contained a provision that
remedies at law for any breach or attempted breach of the agreement would be inadequate
and waived as a defense that either party had an adequate remedy at law. Wright, 137
S.W.3d at 293-94. We noted that we were unaware of any Texas case holding that such
agreements, alone, were controlling on those issues; however, we recognized Texas's strong
public policy in favor of preserving freedom of contract. Id. at 294. We considered the
language of the agreement together with other evidence established by the record, including
testimony that SSG's damages would have been difficult to calculate. Id. at 293-94. 
Following this approach, we conclude that the language of the agreement at issue here is but
one consideration in our analysis to be viewed in conjunction with the record in its entirety. 
See Wright, 137 S.W.3d at 293-94; see also Sheshunoff, 209 S.W.3d at 657. (5)

 In addition to relying on the contract's express language, U.S. Money Reserve argues
that the restraints found in the temporary injunction are reasonable because of the nature of
its business. U.S. Money Reserve asserts that the key to its success in the coin business is
its marketing. It further argues that because of its tremendous investment and experience in
marketing in the coin industry, it has learned which techniques are effective, and its salesman
are provided with confidential information about the company's marketing techniques, which
would give them an unfair advantage in the national coin market if they were allowed to
work for a competitor. Leipsner testified that in addition to the company's customer list, the
marketing materials the company puts together are protected confidential information. 
Leipsner explained that the company discusses the marketing materials with its salesmen
before the materials are distributed to the public. This is done so that the company's
salesmen will be adequately prepared to answer sales calls from the public following the
company's advertising or media campaigns. 

 Nonetheless, it is undisputed that Poole and Fendley worked in sales. While
marketing and advertising materials may have been reviewed or discussed with Poole or
Fendley prior to public distribution, neither Poole nor Fendley were shown during the hearing
to have been hired to head up or develop the company's marketing efforts. Poole testified
that he had "no idea" how the company determined what to include in its advertising. Poole
testified that his job responsibilities as a salesman were limited to making sales calls and
acting as a team leader for his sales team. Likewise, Poole testified that his job
responsibilities did not include determining which cities the ads would run in. While
Leipsner testified that his salespeople were privy to "the rationale and the way that we put
things together" in terms of marketing and advertising, he admitted that crafting this type of
information was not part of Poole's or Fendley's job responsibilities. 

 Viewing the record in its entirety and in the light most favorable to the trial court's
order, we hold that the trial court abused its discretion in entering a temporary injunction
order that was overbroad. (6) Therefore, we overrule issue one and sustain issue two. 

 Courts are generally required to reform overbroad convenants to the extent necessary
to protect the business interest at issue. See Tex. Bus. & Com. Code Ann. § 15.51(c); see
also Tex. R. App. P. 43.3. An exception to this rule exists where remand is necessary for
further proceedings. Tex. R. App. P. 43.3(a); see also Wright, 137 S.W.3d at 299. Our
determination of appellants' final issue requires that we dissolve the order granting the
temporary injunction.

IRREPARABLE INJURY


 Appellants argue in issue three that the trial court abused its discretion in reaching the
implied finding that U.S. Money Reserve would suffer a probable, imminent, and irreparable
injury. Specifically, appellants argue that there is an adequate legal remedy when damages
for breach of contract are available thus, precluding injunctive relief. U.S. Money Reserve
argues that the trial court did not abuse its discretion in reaching the implied finding that U.S.
Money Reserve would suffer a probable, imminent, and irreparable injury because 1) Poole
testified that he does not believe that he or Fendley would have the money to pay a
substantial judgment; 2) the damages suffered by U.S. Money Reserve are incapable of being
measured by any certain pecuniary standard-particularly, the damage to its relationship with
its client-base; and 3) appellants contractually agreed that U.S. Money Reserve would suffer
an irreparable injury if the restrictive covenants were breached and that damages would be
difficult, if not impossible, to calculate. 

 "An injury is irreparable if the injured party cannot be adequately compensated in
damages or if the damages cannot be measured by any certain pecuniary standard." Butnaru,
84 S.W.3d at 204. Damages are inadequate, so as to support a temporary injunction, if they
are difficult to calculate. Rollins v. Universal Coin & Bullion Ltd., No. 09-06-150 CV, 2006
Tex. App. LEXIS 8764, at *13 (Tex. App.--Beaumont Oct. 12, 2006, no pet.) (mem. op.). 
Additionally, "[a]n abuse of discretion does not occur when [a] trial court bases its decision
on conflicting evidence." NMTC Corp. v. Conarroe, 99 S.W.3d 865, 868 (Tex. App.--Beaumont 2003, no pet.). Here, Poole stipulated that he sold coins to customers on U.S.
Money Reserve's customer list after leaving the company. He also admitted that U.S. Money
Reserve could no longer "take [him] at [his] word" when he says he will not contact their
customers. 

 In support of their argument that the trial court abused its discretion, appellants point
out that Leipsner testified that U.S. Money Reserve suffered a twenty percent decline in
revenues since appellants left the company, as well as a five percent increase in gold orders
returned to the company since appellants left. Based on this testimony, appellants argue that
damages are capable of ready calculation. However, Leipsner also testified that he did not
believe that damages could be calculated exactly. While Leipsner admitted placing a
$250,000 liquidated damage value on aspects of appellants' conduct, he testified additionally
that the long-term effects of appellants conduct also needed to be taken into account.
Moreover, while Poole testified that he may be able to take out a loan to satisfy a judgment
in the nature of $20,000, he also testified that he did not think he would be able to satisfy a
judgment in the neighborhood of $50,000 and certainly not a judgment for $250,000. Poole
testified that in his opinion Fendley would also not be able to satisfy such a judgment. (7) 

 U.S. Money Reserve points to the contract language, arguing that appellants expressly
agreed in the employment agreement that U.S. Money Reserve would suffer an irreparable
injury if the restrictive covenants contained within the contracts are breached. Further,
appellants expressly acknowledge in the contract that it would be difficult, if not impossible,
to calculate damages as a result of a breach of the restrictive covenants. Considering the
language in the contract in conjunction with the testimony in the record, we cannot say the
trial court erred in making the implied finding that U.S. Money Reserve, prior to trial, would
suffer a probable imminent and irreparable injury. Issue three is overruled.

COMPLIANCE WITH RULE 683


 In conjunction with their final issue, Appellants argue that the order granting the
temporary injunction is void under Rule 683 of the Texas Rules of Civil Procedure. U.S.
Money Reserve argues that appellants have waived any right to raise that issue on appeal. 
Rule 683 provides in pertinent part:

 Every order granting an injunction and every restraining order shall set
forth the reasons for its issuance; shall be specific in terms; shall describe in
reasonable detail and not by reference to the complaint or other document, the
act or acts sought to be restrained; and is binding only upon the parties to the
action, their officers, agents, servants, employees, and attorneys, and upon
those persons in active concert or participation with them who receive actual
notice of the order by personal service or otherwise. 


 Every order granting a temporary injunction shall include an order
setting the cause for trial on the merits with respect to the ultimate relief
sought.


Tex. R. Civ. P. 683. We recognized in International Brotherhood of Electrical Workers
Local Union 479 v. Becon Construction Co. Inc., 104 S.W.3d 239, 244 (Tex. App.--Beaumont 2003, no pet.), that "[t]he reasons given by the trial court for granting a temporary
injunction must be specific and legally sufficient, and not mere conclusory statements." We
stated,

 [B]ecause probable injury subsumes the elements of irreparable injury and no
adequate remedy at law, a valid injunction must articulate the reasons why the
identified probable injury is an irreparable one for which [applicants] have no
adequate legal remedy. Consequently, the specificity required by Rule 683 is
not satisfied by the mere recital of no adequate remedy at law and irreparable
harm.


Id. (citations and internal quotation marks omitted). We concluded that "'[t]he failure to
include in the order a reason why the court deems issuance of the writ proper for preventing
injury to the applicant is reversible error.'" Id. (quoting Stoner v. Thompson, 553 S.W.2d
150, 151 (Tex. Civ. App.--Houston [1st Dist.] 1977, writ ref'd n.r.e.)). 

 In Int'l Brotherhood, we addressed the issue of whether the requirements of Rule 683
could be waived. Id. at 243. We recognized that in InterFirst Bank San Felipe, N.A. v. Paz
Construction Co., the Texas Supreme Court held that the requirements of Rule 683 are
mandatory and must be strictly followed. Id. (citing InterFirst, 715 S.W.2d 640, 641 (Tex.
1986)). "[W]hen an order of temporary injunction fails to adhere to these requirements it is
subject to being declared void and dissolved." Id. In Int'l Brotherhood we rejected the
argument that appellants waived any issues concerning failure to comply with Rule 683 and
held, in line with the great weight of authority following InterFirst, that a defective order
granting a temporary injunction could not be validated by means of waiver. Id. 

 Here, U.S. Money Reserve argues that appellants waived the right to raise this issue
on appeal not only because they failed to raise it in the trial court, but also because appellants
agreed to the court's judgment, wherein the phrase "Agreed as to Form Only" prefaced
appellants' counsel's signature. The San Antonio Court of Appeals recently addressed this
very issue. See In re Garza, 126 S.W.3d 268 (Tex. App.--San Antonio 2003, orig.
proceeding [mand. denied]). 

 In Garza, appellant argued that because "the temporary injunction failed to (1) set a
trial setting pursuant to Texas Rule of Civil Procedure 683 and (2) set bond pursuant to Texas
Rule of Civil Procedure 684, the temporary injunction [was] void." Id. at 270. In response,
appellee argued that Garza "waived her complaint by agreeing to the terms of the temporary
injunction." Id. Specifically, the temporary injunction stated that the parties agreed to the
terms of the order as evidenced by their signatures, which were prefaced by the phrase
"Approved as to Form Only." Id. Appellee argued that appellant was barred from
complaining about the order on appeal relying on case law stating that "a party may not
appeal from or attack a judgment to which he has agreed, absent allegation and proof of
fraud, collusion, or misrepresentation." Id. (citing Henke v. Peoples State Bank, 6 S.W.3d
717, 720 (Tex. App.--Corpus Christi 1999, pet. dism'd w.o.j.)).

 The court in Garza recognized that "[a] void order has no force or effect and confers
no rights; it is a mere nullity." Id. at 271 (citing Slaughter v. Qualls, 139 Tex. 340, 345, 162
S.W.2d 671, 674 (1942)). Thus, the court concluded, "a party who agrees to a void order has
agreed to nothing." Id. The court then undertook to determine whether the trial court's order
granting the temporary injunction was "void" or merely "voidable." Id. The court
recognized that the Texas Supreme Court spoke to this issue in Qwest Communications Corp.
v. AT&T Corp., 24 S.W.3d 334 (Tex. 2000) (per curiam). 

 In Qwest appellants argued that the trial court's order was not a temporary injunction
because it failed to set the case for trial on the merits or set a bond as required by Rules 683
and 684 of the Texas Rules of Civil Procedure. Quest, 24 S.W.3d at 337 (citing Tex. R. Civ.
P. 683, 684). The Court disagreed stating,

 These procedural requirements are mandatory, and an order granting a
temporary injunction that does not meet them is subject to being declared void
and dissolved. In InterFirst Bank, however, the order failed to set the case for
trial on the merits. Yet rather than dismissing the appeal for want of
jurisdiction, we declared the temporary injunction void and ordered it
dissolved. We have also held that a temporary injunction was void when there
was no bond. Here, these procedural requirements may render the trial court's
order void but they do not change the order's character and function defining
its classification. 


Id. (citations omitted). Based on this language, the court of appeals in Garza concluded that
unless a temporary injunction complies with Rules 683 and 684, it is void. Garza, 126
S.W.3d at 273; see also Int'l Brotherhood, 104 S.W.3d at 244. Based on the Court's holding
in Qwest, the court in Garza held that the temporary injunction, which failed to comply with
Rules 683 and 684, was void even though the parties expressly agreed to the temporary
injunction order. Garza, 126 S.W.3d at 273. The Texas Supreme Court recently clarified
its holding in Interfirst stating "[o]rders that fail to fulfill [the] requirements [of Rule 683]
are void." In re Office of the Attorney General, 257 S.W.3d 695, 697 (Tex. 2008) (per
curiam).

 The trial court's order granting the temporary injunction in favor of U.S. Money
Reserve does not set forth any reasons for issuance of the temporary injunction or otherwise
state any reason why the identified probable injury is an irreparable one for which U.S.
Money Reserve has no legal remedy. Further, the order does not include a date setting the
matter for trial as required by Rule 683. Tex. R. Civ. P. 683. Instead, the order attempts to
enjoin the parties through a date certain in the future, January 25, 2011. The purpose of a
temporary injunction is to preserve the status quo through the date of trial. See Butnaru, 84
S.W.3d at 204. 

 While the trial court did not abuse its discretion in granting a temporary injunction to
maintain the status quo, it did abuse its discretion in entering the temporary injunction order
as crafted. We hold that the temporary injunction order is void as it is overly broad and fails
to comply with the requirements of Rule 683. Tex. R. Civ. P. 683. We dissolve the
temporary injunction. 

 REVERSED AND REMANDED. 


 


 __________________________________

 CHARLES KREGER

 Justice



Submitted on June 26, 2008

Opinion Delivered October 30, 2008


Before Gaultney, Kreger, and Horton, JJ.
1. We note that the court's order appears to have erroneously misspelled Terry
Fendley's name as "Terry Finley." 
2. We note that while appellants argue that the trial court's order follows the language
of the restrictive covenants in their employment agreements verbatim, this is not the case. 
The language in Poole's and Fendley's agreements differed from the language in some of the
older employment agreements, which appear to have been inadvertently referenced by
appellants in their brief. A significant difference in the agreements at issue and the
agreement referenced is that the term "clients" is defined in the agreements of Poole and
Fendley as set forth above. Likewise, the agreement set forth above is the agreement that
Poole authenticated and testified to during the hearing. While existing and potential
customers and clients are defined in these employment agreements, the trial court's order
granting the temporary injunction made no attempt whatsoever to define "existing or
potential clients or customers."
3. See Sheshunoff, 209 S.W.3d at 656.
4. We note that Texas decisions analyzing the reasonableness of time, geography, and
scope of activities restricted in covenants not to compete are fact-specific and those decisions
vary depending largely on the particular facts and circumstances of each individual case. The
nature of the employer's business and the job responsibilities and involvement of the subject
employee are usually taken into account. For example, we note that other courts have found
nation-wide exclusions reasonable where the covenant accompanied the sale of a business
and was enforced against its prior owner. See Vais Arms, Inc. v. Vais, 383 F.3d 287, 295-96
n.20 (5th Cir. 2004) (citing Williams v. Powell Elec. Mfg. Co., 508 S.W.2d 665, 668 (Tex.
Civ. App.--Houston [14th Dist.] 1974, no writ) (nationwide injunction not an abuse of
discretion where business sold was national in character)) (geographic scope of noncompete
agreement was reasonable and enforceable against prior business owner where business
owner had advertised his product in nationally-distributed trade publications, mail order
catalogues, and the internet). In those cases, the individual restricted by the covenant had a
more unique and specialized knowledge of the business and the business interests at issue. 
See also Curtis v. Ziff Energy Group, Ltd., 12 S.W.3d 114, 118-19 (Tex. App.--Houston
[14th Dist.] 1999, no pet.) (restrictive covenant upheld against the former Vice President of
Pipelines and Energy Marketing, which prevented him from working for any similar
company in North America for a period of six months, where former Vice President was
hired to "head up and build up the U.S. practice in the areas of consulting regarding
pipeline/transportation issues, and energy marketing).
5. We note that this analysis is in line with the analysis employed by courts in other
jurisdictions when analyzing covenants containing similar acknowledgments. See Webster
Ins., Inc. v. Levine, NNHCV074026861S, 2007 Conn. Super. LEXIS 3410, at *11-12 (Conn.
Super. Ct. Dec. 21, 2007) (unpublished) ("Private parties cannot dictate a conclusion that
injunctive relief is required . . . . The agreement to this effect is probably some evidence . .
. ." (quoting Custard Ins. Adjusters Inc. v. Nardi,, CV 980061967S, 2000 Conn. Super.
LEXIS 1003, at *158 (Conn. Super. Ct. Apr. 20, 2000))) (Levin's concession in the
agreement is merely evidence the court may weigh in determining whether Webster met his
burden of proof with regard to irreparable harm and lack of an adequate remedy at law.); see
also Herring Gas Co. v. Magee, 813 F.Supp. 1239, 1241, 1245-46 (S.D. Miss. 1993)
(evaluating the reasonableness of the restrictive covenants without regard to contract
language wherein the employees expressly acknowledged that the restrictions were
reasonable); Jackson Hewitt Inc. v. Childress, No. 06-CV-0909, 2008 U.S. Dist. LEXIS
24460, at *20-23 (D.N.J. Mar. 27, 2008) (unpublished) (considering acknowledgments of
reasonableness along with other evidence in the record); Hagemeyer N. Am. Inc. v.
Thompson, No. 2:05-3425, 2006 U.S. Dist. LEXIS 19468, at *5, 12-16 (D.S.C. Mar. 1, 2006)
(unpublished) (employee's acknowledgment of reasonableness of the restrictive covenants
was considered in conjunction with other evidence in the record).
6. Notably, U.S. Money Reserve acknowledged at the temporary injunction hearing that
the industry-wide exclusions such as the one at issue here have been held unreasonable and
that the covenant at issue may need to be reformed. Counsel stated, 


 Now, the only area that this thing would possibly need to be reformed
on is something we're willing to stipulate for the Court. It does have a
nationwide, industrywide exclusion and to start off we're willing to tell the
Court that we are willing to reform that to make it no competition if they are
located in the state of Texas or any of the surrounding states with the state of
Texas. 


 Therefore, if they want to sell coins in the state of Kentucky or the state
of Georgia or Alaska or on the West Coast, we feel that's fine. . . . 


Counsel additionally stated: "What I'm saying is that an industrywide, nationwide exclusion
has been held unreasonable; . . . . [s]o, what I'm suggesting is, . . . the trial court merely has
to make a decision on the trial court's own as to the scope of the geographic restriction."
Appellant-employees, on the other hand, argued that the covenant needed to be reformed to
prevent the employees from soliciting clients with whom they had contact while working for
U.S. Money Reserve or who were clients of the company. In fact, there is evidence in the
record that Poole agreed to enter into an injunction prohibiting him from contacting U.S.
Money Reserve clients. The trial court refrained from reforming the covenant prior to
hearing testimony and allowed the parties to move forward. 
7. While there is evidence in the record that Fendley was subpoenaed, he failed to
appear at the injunction hearing.