**REVERSE and REMAND and Opinion Filed August 15, 2024**



**In The**
**Court of Appeals**
**Fifth District of Texas at Dallas**

_____

**No. 05-24-00056-CV**
_____

**CHRIS HIPPS, Appellant**
**V.**
**CBRE, INC., Appellee**

**On Appeal from the 95th District Court**
**Dallas County, Texas**
**Trial Court Cause No. DC-23-20605**

## MEMORANDUM OPINION

Before Justices Smith, Miskel, and Breedlove
Opinion by Justice Breedlove

In this suit to enforce a noncompetition covenant, the trial court granted a temporary injunction for plaintiff/appellee CBRE, Inc. In four issues, defendant/appellant Chris Hipps contends the trial court abused its discretion by granting the injunction because CBRE failed to show its entitlement to injunctive relief, the injunction is overbroad and violates the Texas Covenants Not to Compete Act, and the injunction order does not meet the requirements of rule 683, Texas Rules of Civil Procedure. Concluding that the injunction is overbroad in its

geographical scope but is otherwise enforceable, we remand to the trial court for further proceedings consistent with this opinion.

## BACKGROUND

Hipps was employed as a "Senior Managing Director" for Dallas/Fort Worth at CBRE when he resigned in December 2023 to accept a position as "Texas Managing Principal" at CBRE's competitor Cushman & Wakefield. At the time of his resignation, two agreements were in force between Hipps and CBRE: (1) a 2021 "Employment Agreement–Manager" (EA) containing a one-year non-solicitation period and a provision for protection of confidential information for two years after termination of Hipps's employment, and (2) a 2021 Restrictive Covenants Agreement (RCA) containing a noncompetition clause:

> 1.4 Non-Competition. During your employment by any member of the Company Group and, solely if, prior to December 31, 2025, you are terminated by the relevant Company Group member with Cause or you resign without Good Reason, during the Restricted Period, you will not directly or indirectly, (a) become a principal, partner, member, investor, joint venturer, officer, director, or shareholder of any Restricted Business, or (b) manage, control, or operate any Restricted Business, or (c) serve as an employee, consultant, contractor, advisor, representative (or any other capacity) of, to or for a Restricted Business (except to the extent you serve in any such capacity that is unrelated to the products or services that are competitive with products or services provided by the Company Group). . . . If your employment terminates at any point after December 31, 2025, then this Section 1.4 will no longer apply.

The RCA further defines a "Restricted Business" as "any entity or person that provides products or services that are competitive with products or services provided by the Company Group within 24 months prior to your Termination Date." The RCA

–2–

broadly defines the "Company Group" as CBRE Group, Inc. and each of its subsidiaries and affiliates. The "Restricted Period," applicable to both the noncompete and non-solicitation obligations, is the period of twelve months following Hipps's termination.

Similarly, the EA prohibits solicitation of "CBRE's clients whom [Hipps] solicited or with whom [he] dealt or became acquainted while [he] was employed with CBRE" and solicitation of CBRE's salespeople or employees for one year following termination of Hipps's employment with CBRE.

The RCA includes a recital of the consideration CBRE promised to provide. In addition to access to "new and additional" training, clients, and client information, CBRE promised to pay Hipps a $1 million "Retention Incentive." Hipps received the Retention Incentive but denies that there was any change to the training and information he had always received while employed at CBRE.

Shortly after Hipps's resignation, CBRE filed this suit for breach of contract and sought injunctive relief. The trial court granted CBRE a temporary restraining order, then held a hearing on CBRE's request for temporary injunctive relief. The trial court heard testimony from Hipps and from Brooke E. Armstrong, CBRE's President.

At the hearing, CBRE offered evidence that on December 11, 2023—Hipps's first day at Cushman—Hipps was already working to refer "a potential property management opportunity in Southern California" with Dallas-based Granite

Properties to Cushman's California office. CBRE also offered evidence that Hipps had corresponded with Greg Fuller, Granite's President and Chief Operating Officer, the previous week about the same opportunity, referring Fuller to Mike Mrozek, CBRE's "Property Management COO." CBRE also offered evidence that Hipps exchanged text messages with Fuller earlier on December 11, informing Fuller that "I should have you connected with the appropriate Cushman PM person by day's end."

Hipps testified, however, that Fuller had already planned to contact both CBRE and Cushman about the opportunity, and Hipps was "merely connecting Mr. Fuller with the right person" in Cushman to do so, as "a courtesy" based on his "long-standing" friendship with Fuller. Fuller initiated the text message exchange on December 9, and Hipps explained that "[t]here were no other motives in me trying to help Mr. Fuller find the right person at a company he had already planned to reach out to and in fact had already gotten the name for." He also testified that his contacts with Granite pre-dated his employment with CBRE, and that Granite "did not do property management and leasing business" with CBRE, "[b]ecause Granite self-manages and self-performs leasing." Armstrong, however, testified that "CBRE has had business relations with Granite as long as they've been in business," although she provided no more specific information.

Hipps also testified that he had "responded to clients of CBRE reaching out to me" after the press release announcing his move to Cushman, and had spoken

–4–

with "about 45 or 50 CBRE employees" during the same time period. He denied having "affirmatively reach[ed] out to any of those individuals," however, or doing "anything to solicit business from any of those individuals," and did not encourage any employees either to leave CBRE or to join Cushman. He admitted that Cushman offered him inducements including repayment of the $1 million Retention Incentive, payment of his legal fees in litigation with CBRE, and payment of his salary even if he had "to sit out" for the duration of the RCA's one-year period. But he testified that it is "career-changing if you are absent from this industry for a year," and explained that he could work at Cushman while maintaining the confidentiality of CBRE's information and not soliciting CBRE's clients.

Armstrong admitted that other than Hipps's contacts with Granite, CBRE had no "facts to indicate" that Hipps solicited any other CBRE client or prospective client. She also testified that when she joined CBRE in 2021, she was able to comply with the confidentiality and non-solicitation obligations she owed to her previous employer.

By order dated January 2, 2024 (Order), the court granted a temporary injunction prohibiting Hipps from working at Cushman for twelve months, working for any competitor of CBRE's for twelve months,[1] "communicating with any CBRE

---

[1] This provision prohibited Hipps from working for a "Restricted Business," defined in the RCA to mean "any entity or person that provides products or services that are competitive with products or services provided by" CBRE "within 24 months prior to your Termination Date (or which you have knowledge, at the time in question, that the Company Group has plans to provide or offer within twelve months of your Termination Date.)"

client in order to further a business relationship with such CBRE client for or on behalf of Cushman & Wakefield," and using or disclosing CBRE's confidential information, "including the identity of CBRE customers, clients, contacts, or prospective contacts."

This appeal followed. The trial court amended its Order after Hipps filed his brief in this Court. The "Amended Order Granting Plaintiff's Application for Temporary Injunction" (Amended Order) added time limits, attached copies of the two agreements, and added certain definitions. In his reply brief, Hipps addressed these modifications. We "treat the appeal as from" the March 7, 2024 Amended Order, but also consider the original January 2, 2024 Order granting CBRE's application for temporary injunction to provide additional context in reviewing Hipps's issues. *See* TEX. R. APP. P. 27.3.[2]

## ISSUES AND STANDARD OF REVIEW

In four issues, Hipps contends the trial court erred by granting the temporary injunction because (1) the Order "enforces a world-wide non-compete obligation, without regard to Mr. Hipps' duties and responsibilities at a competitor," in violation of the Texas Covenants Not to Compete Act, (2) the Order "restrains conduct that is

---

[2] Rule 27.3 provides in part, "After an order or judgment in a civil case has been appealed, if the trial court modifies the order or judgment, or if the trial court vacates the order or judgment and replaces it with another appealable order or judgment, the appellate court must treat the appeal as from the subsequent order or judgment and may treat actions relating to the appeal of the first order or judgment as relating to the appeal of the subsequent order or judgment." TEX. R. APP. P. 27.3.

not prohibited by the underlying restrictive covenants and/or is protected by the Texas Covenants Not to Compete Act," (3) CBRE failed to show that it would suffer a probable, imminent, and irreparable injury if injunctive relief were not granted, because it presented no evidence of any actual or threatened harm, and (4) the Order provides no rationale for its entry as required by rule 683, Texas Rules of Civil Procedure.

"Whether to grant or deny a temporary injunction is within the trial court's sound discretion." *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex. 2002). "A reviewing court should reverse an order granting injunctive relief only if the trial court abused that discretion." *Id.* "The reviewing court must not substitute its judgment for the trial court's judgment unless the trial court's action was so arbitrary that it exceeded the bounds of reasonable discretion." *Id.*

"In reviewing the trial court's decision, we draw all legitimate inferences from the evidence in the light most favorable to the trial court's judgment." *RWI Constr., Inc. v. Comerica Bank*, 583 S.W.3d 269, 274 (Tex. App.—Dallas 2019, no pet.); *see also McGuire-Sobrino v. TX Cannalliance LLC*, No. 05-19-01261-CV, 2020 WL 4581649, at *6 (Tex. App.—Dallas Aug. 10, 2020, no pet.) (mem. op.) ("The trial court has broad discretion in determining whether the pleadings and evidence support a temporary injunction."). We defer to the trial court's resolution of conflicting evidence. *Jowell v. BioTE Med., LLC*, No. 05-21-00166-CV, 2021 WL 4810361, at *8 (Tex. App.—Dallas Oct. 15, 2021, no pet.) (mem. op). "However,

the trial court abuses its discretion when it misapplies the law to established facts or when the evidence does not reasonably support the trial court's determination of the existence of probable injury or probable right of recovery." *RWI Constr., Inc.*, 583 S.W.2d at 274–75.

**DISCUSSION**

**A. Requirements for temporary injunction**

"A temporary injunction's purpose is to maintain the status quo of the litigation's subject matter pending a trial on the merits." *Butnaru*, 84 S.W.3d at 204. "A temporary injunction is an extraordinary remedy and does not issue as a matter of right." *Id.* To obtain a temporary injunction, the applicant must plead and prove (1) a cause of action against the defendant, (2) a probable right to the relief sought, and (3) a probable, imminent, and irreparable injury in the interim. *Id.* In its Amended Order, the trial court made findings and conclusions on each of these elements.

"An appellate court determination that a party has shown a probable right to relief does not mean that the party obtaining temporary relief will prevail on the merits based on a fully developed record." *Bienati v. Cloister Holdings, LLC*, 691 S.W.3d 493, 498 (Tex. 2024). "The assumption is that the evidence may well change between the preliminary temporary-injunction stage of the proceedings and a final trial on the merits." *Contract Datascan Holdings, Inc. v. Retail Servs. WIS Corp.*, No. 02-23-00153-CV, 2023 WL 7851509, at *9 (Tex. App.—Fort Worth Nov. 16,

2023, no pet.) (mem. op.). The applicant must, however, "present enough evidence to raise a *bona fide* issue as to its right to ultimate relief." *Kim v. Oh*, No. 05-19-00947-CV, 2020 WL 2315854, at *2 (Tex. App.—Dallas May 11, 2020, no pet.) (mem. op.).

For purposes of a temporary injunction, an injury is irreparable if the injured party cannot be adequately compensated in damages or if the damages cannot be measured by any pecuniary standard. *El Tacaso, Inc. v. Jireh Star, Inc.*, 356 S.W.3d 740, 743 (Tex. App.—Dallas 2011, no pet.). "The general rule at equity is that before injunctive relief can be obtained, it must appear that there does not exist an adequate remedy at law." *Butnaru*, 84 S.W.3d at 210 (internal quotation omitted). "An adequate remedy at law is one that is as complete, practical, and efficient to the prompt administration of justice as is equitable relief." *El Tacaso, Inc.*, 356 S.W.3d at 744 (internal quotations omitted).

## B. Probable right to relief sought: breach of contract claim

To raise "a *bona fide* issue as to its right to ultimate relief," CBRE was required to produce some evidence supporting every element of at least one valid legal theory. *Kim*, 2020 WL 2315854, at *2; *Holdings I, LLC v. Argonaut Ins. Co.*, 640 S.W.3d 915, 923 (Tex. App.—Dallas 2022, no pet.). The probable right to relief element does not require the applicant to show that it will prevail at trial, nor does it require the trial court to evaluate the probability that the applicant will prevail at trial. *See Daugherty v. Ellington*, No. 05-22-00991-CV, 2024 WL 177482, at *5

(Tex. App.—Dallas Jan. 17, 2024, pet. denied) (mem. op.) (collecting cases). The ultimate merits of the case are not before the trial court. *Id.*

CBRE has pleaded that Hipps has breached the noncompetition provisions of the RCA. Accordingly, we consider whether CBRE has "plead[ed] and prove[d]" a cause of action for breach of the RCA sufficiently to meet the standards for obtaining a temporary injunction. *See Butnaru*, 84 S.W.3d at 204. "A successful breach of contract claim requires proof of the following elements: (1) a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained by the plaintiff as a result of that breach." *Petras v. Criswell*, 248 S.W.3d 471, 477 (Tex. App.—Dallas 2008, no pet.). CBRE was required to produce some evidence to support every element of its claim. *See Kim*, 2020 WL 2315854, at *2.

Hipps contends that the RCA's noncompetition provision is invalid and unenforceable because it lacks consideration and is overbroad, and therefore, violates Texas law. Therefore, he asserts, CBRE cannot raise a *bona fide* issue on its breach of contract claim.

### 1. Consideration for the noncompetition provision

Hipps argues the RCA is unenforceable because it lacks consideration. Consideration is an essential element of any valid contract, *Gilbert v. Fitz*, No. 05-16-00218-CV, 2016 WL 7384167, at *4 (Tex. App.—Dallas Dec. 21, 2016, no pet.) (mem. op.), and in the context of noncompetes, ensures that the promise to

refrain from competition does not unreasonably restrain trade. *See Marsh USA Inc. v. Cook*, 354 S.W.3d 764, 775–76 (Tex. 2011) (citing RESTATEMENT (SECOND) OF CONTRACTS § 187 cmt.b).[3] "[A] covenant not to compete is enforceable if it is ancillary to or part of an otherwise enforceable agreement at the time the agreement is made . . . ." TEX. BUS. & COM. CODE ANN. § 15.50(a).

Discussing the consideration requirement in the context of noncompete agreements, the court in *Marsh USA* explained that § 15.50(a) requires noncompete covenants to be ancillary to or a part of otherwise enforceable agreements arising from the employment relationship. *See id.* The court concluded, "[c]onsideration for a noncompete that is reasonably related to an interest worthy of protection, such as trade secrets, confidential information or goodwill, satisfies the statutory nexus." *Id.*

In the RCA, CBRE "promise[d] to provide [Hipps] with (a) access to new and additional training, (b) access to new and additional clients and client information, (c) access to new and additional confidential and proprietary market knowledge, pricing information, technology tools and solutions, and other Confidential Information (as defined herein) belonging to us, and/or (d) other consideration including a $1,000,000 Retention Incentive." Armstrong testified that Hipps received all of the promised consideration from CBRE after he signed the RCA.

---

[3] Comment b, "Non-ancillary restraints," provides that "for a promise to refrain from competition to be reasonable, the promisee must have an interest worthy of protection that can be balanced against the hardship on the promisor and the likely injury to the public."

Hipps acknowledged that he received access to the information and training described, although he testified that he had always had such access both before and after he signed the RCA. He contends, however, that the RCA lacks consideration and is an unenforceable restraint on trade because (1) nothing new happened in 2021 to make the RCA necessary, (2) many other CBRE employees had access to the same confidential information without signing noncompete covenants, and (3) the RCA contains no protection for confidential information obtained even one day after its expiration, "plainly confirm[ing] that the covenant's 'true purpose' was "to restrain Hipps's movement for a period of time," not to protect confidential information.

CBRE responds to each of these arguments. First, Armstrong testified that CBRE in "the last few years" had determined that noncompetes were necessary for employees "at a certain level" to protect client relationships and business interests. *See Alex Sheshunoff Mgmt. Servs., L.P. v. Johnson*, 209 S.W.3d 644, 657 (Tex. 2006) ("Although ASM had given Johnson access to the same marketing information without a covenant not to compete, nothing precluded ASM from seeking the greater protection of a covenant when it did."). Second, CBRE relies on evidence that there were other employees in high-ranking positions who were required to sign noncompetition agreements. As to Hipps in particular, CBRE cites Hipps's testimony that he left CBRE once during his tenure and considered doing so again in 2015. CBRE argues that Hipps's "demonstrated wanderlust" warranted additional

–12–

protections. Third, as to protection of confidential information after 2025, Armstrong testified that "[w]e don't plan two years out for those things."

We conclude that CBRE met its burden to plead and prove a cause of action for breach of the RCA sufficient to meet the standards for obtaining a temporary injunction. *See Butnaru*, 84 S.W.3d at 204. We overrule Hipps's complaint contending otherwise.

## 2. Geographic scope of the noncompetition provision

The RCA provides that Hipps "will not, in any capacity, directly or indirectly, (a) solicit, contact, call upon or communicate with any CBRE Client in order to further a business relationship with such CBRE Client for or on behalf of a Restricted Business in the Territory." "Territory" is a defined term in the RCA:

> "**Territory**" means any national, state, territorial or other jurisdiction globally in which the Company Group provided or offered products or services at any time during the 12 months prior to the Termination Date (or in which you have knowledge, at the time in question, that the Company Group has plans to commence providing or offering products or services within 12 months).

"[A]s a general rule, a reasonable geographic restriction for covenants not to compete is the territory in which the employee actually worked while in the contractual employment." *AmeriPath, Inc. v. Hebert*, 447 S.W.3d 319, 335 (Tex. App.—Dallas 2014, pet. denied). A restrictive covenant "must not restrain [an employee's] activities into a territory into which his former work has not taken him or given him the opportunity to enjoy undue advantages in later competition with his

employer." *Peat Marwick & Main Co. v. Haass*, 818 S.W.2d 381, 387 (Tex. 1991) (internal quotation omitted).

"Noncompete covenants with broad geographical scopes have been held unenforceable, particularly when no evidence establishes that the employee actually worked in all areas covered by the covenant." *Zep Mfg. Co. v. Harthcock*, 824 S.W.2d 654, 661 (Tex. App–Dallas 1992, no writ); *see also Butler v. Arrow Mirror & Glass, Inc.*, 51 S.W.3d 787, 793–94 (Tex. App.—Houston [1st Dist.] 2001, no pet.) ("A covenant not to compete with a broad geographical scope is unenforceable, particularly when no evidence establishes the employee actually worked in all areas covered by the covenant.").

CBRE did not offer any evidence to support a worldwide geographic restriction. CBRE relies on Hipps's testimony that if a client contacted him "seeking to do business outside of DFW," Hipps would refer the client to "the market leader who resides in the place where the business is intended to be conducted." CBRE argues this testimony means that "Hipps would facilitate business for CBRE outside the Dallas/Fort Worth region by flipping deals to his colleagues in CBRE's other offices," both in the United States and internationally.

As its "real world example," however, CBRE cites Hipps's referral of Granite Properties to "CBRE's California people." CBRE did not offer any evidence that Hipps had clients outside the United States; CBRE cites only Hipps's testimony that "some of" his clients in the Dallas/Fort Worth area "also had business outside the

–14–

Dallas/Fort Worth area." Armstrong's testimony was that Hipps "served in a regional leadership capacity," not a worldwide one, and that some of the brokers who reported to Hipps "transacted business nationally and internationally." Armstrong also testified that Hipps did not have worldwide responsibilities.

CBRE cites three cases in support of its argument that an unlimited worldwide scope was appropriate,[4] most notably an opinion from this Court concluding that the geographic scope of an injunction order was not broad enough. In *Gehrke v. Merritt Hawkins & Associates, LLC*, No. 05-18-01160-CV, 2020 WL 400175, at *1, 4 (Tex. App.—Dallas Jan. 23, 2020, pet. denied) (mem. op.), we concluded that an injunction's geographic restraint "was arbitrary and too narrow" because it did not extend to the entire territory covered by the noncompetition agreement. The agreement at issue contained a specific provision prohibiting Gehrke from competing in states where he worked during his last year with his former employer. *Id.* Although we held that the agreement extended to "those states as a whole," rather than a smaller territory identified in the trial court's injunction, we also noted that

---

[4] Some of these cases address the geographical scope of an injunction order in addition to the geographical scope of the underlying noncompete provision. Here, the RCA and the Amended Order define "Territory" in almost-identical terms. The RCA's definition is quoted above. The Amended Order includes the court's finding that Hipps is engaging in the same or similar business as CBRE "in a limited 'Territory' (any national, state, territorial, or other jurisdiction where CBRE provides, or provided within 12 months, its products or services) for a 'Restricted Business.'" The Amended Order also references § 1.2 of the RCA, prohibiting solicitation of "CBRE Clients" in "the Territory." Because the Amended Order and the RCA contain similar geographical restrictions, the cases addressing a noncompete provision, an injunction order, or both may be instructive in our analysis.

neither the noncompete nor the injunction "imposed an unreasonable, industry-wide restriction." *Id.*

In *Accruent, LLC v. Short*, No. 1:17-CV-858-RP, 2018 WL 297614, at *1, 5 (W.D. Tex. Jan. 4, 2018) (Order), the court found reasonable a covenant that "extend[ed] to every state or country in which [the former employer] did business." The court noted that the former employee—an engineer as well as a director of client services—had "intimate knowledge of all . . . product functionality" and product development, in addition to sales, marketing, and customer information. *See id.* And in *Everett Financial, Inc. v. Primary Residential Mortgage, Inc.*, Civ. Action No. 3:14-CV-1028-D, 2016 WL 7378937, at *8 (N.D. Tex. Dec. 20, 2016) (mem. op. and order), the court upheld a covenant without a geographical limitation that prohibited solicitation of the former employer's current employees.

In contrast to these cases, CBRE did not offer evidence at the temporary injunction hearing to support a global restriction. Hipps testified that information he received relating to clients "was largely restricted to Dallas/Fort Worth." At most, there was testimony that Hipps had access to regional and national market information, participated "national leadership calls," and had referred deals outside the Dallas/Fort Worth area to brokers in the relevant regions. Although Armstrong testified that Hipps "had a number of brokers reporting to him who transacted business nationally and internationally," she provided no further detail about any

global duties or responsibilities Hipps held or any services he provided in any of CBRE's international business.

The evidence admitted at the temporary injunction hearing does not support a restrictive covenant that covers all areas where CBRE does business globally. *See Peat Marwick & Main Co.*, 818 S.W.2d at 387; *AmeriPath*, 447 S.W.3d at 335. However, this is not fatal to CBRE's ability to show a probable right to relief sought if the noncompete agreement can be reformed. *See* TEX. BUS. & COM. CODE ANN. § 15.51(c). We conclude that considering the evidence in the record, the trial court has the authority under § 15.51(c) to "reform the covenant to the extent necessary to cause the limitations contained in the covenant as to . . . geographical area . . . to be reasonable and to impose a restraint that is not greater than necessary to protect the goodwill or other business interest of the promisee and enforce the covenant as reformed." TEX. BUS. & COM. CODE ANN. § 15.51(c). We remand the case for this purpose.

## C. Imminent and irreparable injury

In his third issue, Hipps contends there is no evidence that CBRE would imminently suffer harm, not compensable in money damages, if the temporary injunction were not imposed pending trial. He argues there is no evidence that he will breach the non-solicitation or confidentiality obligations or that any injury cannot be compensated with monetary damages after trial. Hipps argues that he returned all confidential information to CBRE when he resigned, and in his brief he

maintains that he "will not violate his confidentiality and non-solicitation obligations at his new employment."

CBRE responds that it presented evidence, reasonably credited by the trial court, that "Hipps had breached and will continue to breach his contractual non-solicitation, confidentiality, and non-compete obligations." CBRE relies on evidence it offered to establish that injunctive relief was necessary in addition to monetary damages. CBRE also points to Hipps's stipulation in § 2.3 of the RCA that any breach of the restrictions would cause irreparable harm to CBRE.

"An injury is irreparable if the injured party cannot be adequately compensated in damages or if the damages cannot be measured by any certain pecuniary standard." *Butnaru*, 84 S.W.3d at 204. No abuse of discretion occurs if some evidence reasonably supports the trial court's decision. *Id.* at 211. Further, the trial court does not abuse its discretion when it makes a decision based on conflicting evidence. *Gehrke*, 2020 WL 400175, at *2. "An adequate remedy at law is one that is as complete, practical, and efficient to the prompt administration of justice as equitable relief." *Dass, Inc. v. Smith*, 206 S.W.3d 197, 202 (Tex. App.—Dallas 2006, no pet.).

The trial court heard evidence that before Hipps left CBRE, he referred a client to CBRE's California office, and on the day Hipps joined Cushman, he referred the same client to Cushman's California office. The trial court also heard evidence regarding Hipps's communications with CBRE clients regarding his move to

Cushman. Hipps maintained that these communications were merely polite acknowledgements of clients' good wishes on his new position. CBRE argues, however, that Hipps "cryptically" promised some of the clients he would "fill them in on details soon." Based on this evidence, the trial court made specific findings that Hipps "directly or indirectly solicited and/or communicated with CBRE clients in order to further a business relationship with said CBRE clients on behalf of Cushman & Wakefield" and "solicited CBRE clients to terminate or reduce their relationship with CBRE."

The trial court found that CBRE "is likely to suffer" irreparable harm because Hipps "will, absent this temporary injunction order, continue to have possession of and the ability to use Plaintiff's Confidential Information and violate Defendant's agreed-upon non-competition, non-solicitation, and confidentiality obligations memorialized" in the RCA and the EA. Although "a party can rarely establish an irreparable injury and an inadequate legal remedy when damages for breach of contract are available," *Butnaru*, 84 S.W.3d at 211, courts have also recognized that "assigning a dollar amount to such intangibles as a company's loss of clientele, goodwill, marketing techniques, and office stability, among others, is not easy." *Frequent Flyer Depot, Inc. v. American Airlines, Inc.*, 281 S.W.3d 215, 228 (Tex. App.—Fort Worth 2009, pet. denied) (citing *Martin v. Linen Sys. for Hosps., Inc.*, 671 S.W.2d 706, 710 (Tex. App.—Houston [1st Dist.] 1984, no writ)). Further, we may not overrule the trial court's decision on these matters "unless the trial court

acted unreasonably or in an arbitrary manner, without reference to guiding rules or principles." *Butnaru*, 84 S.W.3d at 211.

From the evidence admitted at the hearing, the trial court reasonably could have concluded that a temporary injunction gave CBRE a remedy more "complete, practical, and efficient to the prompt administration of justice" than a calculation of damages after the fact. *See Dass*, 206 S.W.3d at 197; *Kim*, 2020 WL 2315854, at *3. We conclude CBRE met its burden to show a probable, imminent, and irreparable injury to support its request for a temporary injunction. *See Butnaru*, 84 S.W.3d at 211. We overrule Hipps's third issue.

## D. Challenges to the injunction order

In his second and fourth issues, Hipps argues the Order does not comply with civil procedure rule 683, violates the Texas Covenants Not to Compete Act, and prohibits conduct that is not covered by the underlying restrictive covenant. *See* TEX. R. CIV. P. 683 ("[e]very order granting an injunction . . . shall set forth the reasons for its issuance; shall be specific in terms; shall describe in reasonable detail and not by reference to the complaint or other document, the act or acts sought to be restrained"); *see also In re Luther*, 620 S.W.3d 715, 723 (Tex. 2021) (orig. proceeding, habeas corpus granted) ("failure to specify—with reasonable detail and clarity and without reference to other documents—the precise conduct prohibited" made temporary restraining order too uncertain when measured against rule 683). CBRE responds that the trial court's order "sets forth detailed reasons for its issuance

and adequately describes the acts restrained," and accordingly meets rule 683's requirements.

"The purpose of rule 683's specificity requirement is to ensure that parties are adequately informed of the acts they are enjoined from doing and the reasons for the injunction." *McCaskill v. Nat'l Circuit Assembly*, No. 05-17-01289-CV, 2018 WL 3154616, at *2 (Tex. App.—Dallas June 28, 2018, no pet.) (mem. op.). A temporary injunction order that fails to comply with rule 683 is void. *Indep. Capital Mgmt., L.L.C. v. Collins*, 261 S.W.3d 792, 795 (Tex. App.—Dallas 2008, no pet.). We consider whether the Amended Order meets rule 683's requirements.

**1. Reasons for issuance**

Regarding the reasons for issuance, the Amended Order includes findings that Hipps is in breach of specific sections of the RCA and the EA by:

> engaging in the same or similar business (commercial real estate management; specifically, the growing of a capital markets, lending, and assets services portfolio in the Dallas Fort-Worth Metroplex) in a limited "Territory" (any national, state, territorial or other jurisdiction where CBRE provides, or provided within 12 months, its products or services) for a "Restricted business" (Cushman & Wakefield, a renowned commercial real estate firm) in the "Restricted Period" (12 months after resignation) as those terms are defined in the [RCA].

Both the RCA and the EA are attached to the Amended Order, and the court further specifies the violations found:

> The Court further finds, for the purposes of this temporary injunction order only, that Defendant is in violation of his non-solicitation obligations as described in Sections 1.2 and 1.3 of the [RCA]. Specifically, the court finds Defendant has (1) directly or indirectly solicited and/or communicated with CBRE clients in order to further a

business relationship with said CBRE clients on behalf of Cushman & Wakefield; (2) solicited CBRE clients to terminate or reduce their relationship with CBRE; and/or (3) recruited, solicited, or induced a CBRE employee to terminate or alter his or her status as a CBRE employee, as defined in the Restrictive Covenants Agreement.

We conclude the Amended Order complies with rule 683's requirement to "set forth the reasons for its issuance." TEX. R. CIV. P. 683.

**2. Information at issue**

In the EA, the parties agreed to the following definition of "confidential information":

> "Confidential Information" is defined as any of CBRE's information, without regard to form, which is not commonly known by or available to the public and which information (a) derives economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and (b) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy. Such Confidential Information includes, but is not limited to, CBRE's listings, the identity of and information concerning potential or actual clients, and specialized techniques developed or used by CBRE (other than disclosure of specific listings in the ordinary course of business).

In the Amended Order, this definition has been added in full to paragraphs 12.i, j, and k in describing the actions enjoined. In these paragraphs, Hipps is enjoined from "using, distributing, disseminating, disclosing, or discussing" Confidential Information with any third party (paragraph 12.i); "continuing to retain possession of CBRE's Confidential Information" (paragraph 12.j); and disclosing Confidential Information "to any third-party, including Cushman & Wakefield"

(paragraph 12.k). We conclude the Amended Order "describe[s] in reasonable detail" the information Hipps is prohibited from disclosing. *See* TEX. R. CIV. P. 683.

### 3. Prohibited conduct

Hipps contends the Order is "drastically overbroad and prohibits [him] from engaging in conduct that is not prohibited by the underlying restrictive covenants." He argues that the Order (1) is industry-wide and restricts conduct globally, (2) restricts him for performing any job at all for a competitor of CBRE, regardless of job responsibilities, (3) prohibits contact with CBRE employees "that Mr. Hipps never worked with and had no contact with during his tenure" at CBRE, (4) contains broader restrictions on client contact than either the EA or the RCA and impermissibly extends to clients with whom he had no dealings, and (5) contains no time limitation for most of the restrictions.

CBRE "does not contest that an actual industry-wide restraint would be impermissible." *See Gehrke*, 2020 WL 400175, at *2 ("an industry-wide exclusion from subsequent employment is unreasonable"). But CBRE argues that the Amended Order "merely prevents Hipps from taking a role where he is 'competing' with CBRE." CBRE contends Hipps cannot meet his burden to show that the trial court acted arbitrarily or unreasonably by crediting CBRE's evidence that Hipps "had breached and will continue to breach his contractual non-solicitation, confidentiality, and non-compete obligations," especially in light of "Hipps's concession that he was actively in breach of the non-compete."

–23–

CBRE further argues that the Amended Order resolves the issues Hipps identifies in his brief. Hipps disagrees, contending that paragraph 12.d of the Amended Order continues to prohibit him from working in any capacity for a "Restricted Business," defined as "any entity or person that provides products or services that are competitive with products or services provided by CBRE." CBRE contends that paragraph 12.d should be "'read in the context of the entire injunction,'" quoting *Cross v. Chem-Air South, Inc.*, 648 S.W.2d 754, 757 (Tex. App.—Beaumont 1983, no writ). CBRE contends that the Amended Order, read as a whole, "merely prevents Hipps from taking a role where he is 'competing' with CBRE."

Regarding the clients Hipps is prohibited from contacting, the RCA is now attached to the Amended Order. The RCA defines "CBRE Client" as "any of the Company Group's clients or prospective clients whom you solicited, with whom you substantially and directly dealt or became acquainted, or from whom or with respect to whom you obtained confidential information, at any time within the 24-month period immediately preceding your termination date."

Hipps contends that there is no list of clients attached to the amended order despite the trial court's instructions at the hearing on the motion to clarify:

> THE COURT: I'll have [the amended order, if any] on file by Friday. . . . In the meantime, I would like for the plaintiff—I am very familiar with the *McCaskill* . . . case—to provide the Court, obviously copy opposing counsel on that, with a current listing of the clients. I definitely want to make it clear to someone that is under this Court's

order any clients that they should not be soliciting or not talking to during that particular timeframe that the order is in place or until the Court of Appeals tells us differently.

But I do want that clarification, so that it is very clear.

In *McCaskill*, 2018 WL 3154616, at *4, we concluded that an injunction to enforce a noncompetition agreement was not sufficiently specific because it did not "provide the specific information about who the off-limits clients and customers are." We explained:

> Every order granting an injunction must be specific in its terms and describe in reasonable detail, and not by reference to the complaint or other document, the acts sought to be restrained. The purpose of rule 683's specificity requirement is to ensure that parties are adequately informed of the acts they are enjoined from doing and the reasons for the injunction. An injunction must be as definite, clear, and precise as possible and when practicable it should inform the defendant of the acts he is restrained from doing. But it must be in broad enough terms to prevent repetition of the evil sought to be stopped. A trial court abuses its discretion by issuing a temporary injunction order that does not comply with the requirements of rule 683.

*Id.* at *2 (citations omitted). We relied on *Computek Computer & Office Supplies, Inc. v. Walton*, 156 S.W.3d 217, 222–23 (Tex. App.—Dallas 2005, no pet.), where we "determined that because the injunction itself did not provide the specific information as to the off-limits clients, without inferences or conclusions, the trial court's injunction lacked the required specificity." *McCaskill*, 2018 WL 3154616, at *4; *see also Contract Datascan Holdings, Inc.*, 2023 WL 7851509, at *29–31 (citing and quoting *McCaskill* to support conclusion that injunction failed to meet specificity requirements of rule 683 where injunction restrained third party from

using broad classes of confidential information for clients not identified in the record or the order).

CBRE distinguishes our holdings in *Computek* and *McCaskill* on the ground that in both cases, the employee was not the only party enjoined from contacting former clients; the injunctions included the employees' new employers who "cannot be presumed to have knowledge of who [the employees] interacted with as a client" at their former businesses. *See McCaskill*, 2018 WL 3154616, at *4. In *McCaskill*, we distinguished our opinion in *Safeguard Business Systems, Inc. v. Schaffer*, 822 S.W.2d 640, 644 (Tex. App.—Dallas 1991, no writ), where we concluded that an injunction "need not identify the clients by name because it is reasonable to presume the employee is sufficiently familiar with the customers' identities to avoid violating the injunction." *McCaskill*, 2018 WL 3154616, at *4 (citing *Schaffer*, 822 S.W.2d at 644).

In *Schaffer*, we concluded that "evidence of confidential customer names was neither required by law nor appropriate in support of [the plaintiff's] prayer for full injunctive relief." *Schaffer*, 822 S.W.2d at 644. We explained, "[w]here secret customer information was one of the main assets sought to be protected, the trial court would defeat that purpose by requiring the public disclosure of such information." *Id.* Further, we noted, "we do not think it unreasonable to assume that he who is sought to be enjoined is sufficiently familiar with the employer's business and its customers to avoid violating the injunction." *Id.* We concluded, "even when

the names of some customers are in evidence, the trial court may enjoin as to all customers . . . to [e]nsure that the former employee could not benefit from breach of the confidential relationship." *Id.* at 644–45.

Here, the trial court's injunction order restrains only Hipps. Further, the Amended Order defines the class of clients at issue:

> Soliciting or inducing any CBRE Client (as defined in the Attached Restrictive Covenant Agreement to mean "any of the Company Group's clients or prospective clients whom you solicited, with whom you substantially and directly dealt or became acquainted, or from whom or with respect to whom you obtained confidential information, at any time within the 24-month period immediately preceding your termination date") to terminate or reduce its relationship with CBRE for any reason for twelve months after his termination date . . .

Similarly, the paragraph regarding "CBRE Employees" includes a definition of that term and prohibits Hipps from "recruiting, soliciting, or inducing any CBRE Employee . . . to terminate or alter his or her status as a CBRE Employee" during the same twelve-month period.

As Hipps points out, the trial judge stated at the hearing that she would require CBRE to provide a client list. But the judge also subsequently signed the Amended Order that did not contain that requirement, and the Amended Order contained new definitions of "CBRE Client" and "CBRE Employee." We conclude the Amended Order sufficiently describes the clients and employees who Hipps is prohibited from contacting. *See* Tex. R. Civ. P. 683; *Schaffer*, 822 S.W.2d at 644–45.

In sum, we conclude that the Amended Order has alleviated the issues Hipps has identified. The amendments clarify the activities restrained by adding language

from the RCA and EA and attaching both agreements to the Amended Order. The amendments also add specific time limitations to paragraphs 12.a through 12.k, and further define the category of "CBRE Clients" who may not be solicited. We overrule Hipps's second issue.

**4. Geographic scope of the order**

Hipps complains that the trial court abused its discretion because the injunction is global in scope. We agree. As we discussed above, the RCA's geographic scope is overbroad to the extent that it restrains activity in areas of the world where Hipps did not perform services for CBRE. We therefore conclude that the geographic scope provisions of the Amended Order are overbroad and require reformation by the trial court. TEX. BUS. & COM. CODE ANN. § 15.51(c). We sustain this portion of Hipps's fourth issue. [5]

**5. Conclusion**

We conclude that, except as to geographical scope, the Amended Order sufficiently sets forth the trial court's reasoning and describes the acts restrained in reasonable detail as required by rule 683. We sustain Hipps's fourth issue in part on that ground, and overrule his remaining complaints regarding the Amended Order's compliance with rule 683.

---

[5] We note that the trial court added a handwritten note, "geographical limitation is limited to Texas," in its temporary restraining order, but that restriction was not included in either the Order or the Amended Order.

–28–

## CONCLUSION

We reverse the portions of the trial court's March 7, 2024 Amended Order addressing geographic scope and remand the case to the trial court for reformation of the order consistent with this opinion.

/Maricela Breedlove/
MARICELA BREEDLOVE
JUSTICE

240056F.P05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

CHRIS HIPPS, Appellant

No. 05-24-00056-CV     V.

CBRE, INC., Appellee

On Appeal from the 95th District Court, Dallas County, Texas Trial Court Cause No. DC-23-20605. Opinion delivered by Justice Breedlove. Justices Smith and Miskel participating.

In accordance with this Court's opinion of this date, the Court has considered the record on appeal and holds that there was error in part of the trial court's March 7, 2024 "Amended Order Granting Plaintiff's Application for Temporary Injunction." It is **ORDERED** that the portions of the trial court's order addressing the geographic scope of the injunction are **REVERSED** and the case is **REMANDED** to the trial court for further proceedings consistent with the opinion.

It is further **ORDERED** that each party bear its own costs of this appeal.

Judgment entered August 15, 2024